70 F.3d 1507
 43 Fed. R. Evid. Serv. 321
 UNITED STATES of America, Appellee,
v.
Carlton DARDEN, Appellant.
UNITED STATES of America, Appellee,
v.
Carla Simone SEALS, Appellant.
UNITED STATES of America, Appellee,
v.
Michael WILLIAMS, Appellant.
UNITED STATES of America, Appellee,
v.
Raymond AMERSON, Appellant.
UNITED STATES of America, Appellee,
v.
Gerald Douglas HOPKINS, Appellant.
UNITED STATES of America, Appellee,
v.
Jerry Lee LEWIS, Appellant.
UNITED STATES of America, Appellee,
v.
Noble Laverne BENNETT, Appellant.
 Nos. 93-3386, 93-3448, 93-3449, 93-3451 to 93-3453 and 93-3456.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 14, 1995.
Decided Nov. 22, 1995.
 
 Counsel who presented argument on behalf of the appellants Simon Pediel Tonkin, St. Louis, Missouri, argued (Joan E. Flesh, on the brief), for Darden.
 Irene Jeanette Smith, St. Louis, Missouri, argued, for Seals.
 Anita Rivkin-Carothers, Chicago, Illinois, argued, for Williams.
 Alfred A. Speer, St. Louis, Missouri, argued, for Amerson.
 Doris Gregory Black, St. Louis, Missouri, argued, for Lewis.
 James M. Martin, St. Louis, Missouri, argued, for Bennett.
 David L. Thornton, St. Louis, Missouri, argued, for Hopkins.
 Michael K. Fagan, Assistant U.S. Attorney, St. Louis, Missouri, argued (Mary Jane Lyle, Dean R. Hoag, Daniel E. Meuleman, and Sam C. Bertolet, on the brief), for appellee.
 Before BOWMAN, HEANEY, and MORRIS S. ARNOLD, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 The United States presented evidence at the appellants' trial tending to show that Jerry Lee Lewis participated in and became the leader of a powerful criminal racketeering enterprise that for over ten years controlled a large percentage of the market for T's and Blues (a heroin substitute), heroin, and cocaine in north St. Louis. Lewis obtained and maintained his position by murdering competitors and others who threatened his organization (the Jerry Lewis Organization or JLO). The profitable but bloody activities of the appellants in this case, all members of the JLO, were described by other JLO members who eventually cooperated with the government and whose testimony will be set out in detail as necessary throughout this opinion. In essence, the investigation and prosecution of Jerry Lee Lewis and his associates produced evidence of a long-term, violent drug-trafficking enterprise operating behind a facade known as Subordinate Temple No. 1 of the Moorish Science Temple of America (MSTA).[1] Jerry Lee Lewis held the position of Grand Sheik in the MSTA, and the membership of the JLO and the MSTA overlapped. A large number of MSTA/JLO members were arrested when a grand jury handed down the initial indictment in this case in January 1991. A superseding indictment was handed down in September 1992, and the trial of the seven appellants in this case and two other defendants began on October 28, 1992.
 
 
 2
 After a trial lasting almost nine months, one of the longest criminal trials in the history of the Eastern District of Missouri, a jury returned guilty verdicts against all seven appellants on one count of conducting a criminal racketeering enterprise in violation of 18 U.S.C. Sec. 1962(c) (1988), against six appellants (all but Noble Laverne Bennett) on one count of conspiring to conduct and participate in the same criminal racketeering enterprise in violation of 18 U.S.C. Sec. 1962(d), against Jerry Lee Lewis on six counts of committing violent crimes (murder, conspiracy to commit murder, and attempted murder) in aid of a racketeering enterprise in violation of 18 U.S.C. Sec. 1959, and against Raymond Amerson on two counts of committing violent crimes (murder and conspiracy to commit murder) in aid of a racketeering enterprise in violation of 18 U.S.C. Sec. 1959. Two co-defendants were acquitted. The District Court[2] sentenced each appellant to life in prison.
 
 
 3
 On appeal, Jerry Lee Lewis and Noble Laverne Bennett challenge only their convictions while Carlton Darden, Carla Simone Seals, Michael Williams, Raymond Amerson, and Gerald Hopkins challenge both their convictions and their sentences. Appellants, in seven separate briefs running over 620 pages, properly raise forty-two issues.[3] The government's brief runs 336 pages. Because of the lengthy trial, the complexity of the case, and the sheer size of the record, we have accepted these overlength filings. For the reasons stated below, we affirm the convictions of all seven appellants and the sentences of Darden, Seals, Williams, Amerson, and Hopkins.
 
 I.
 
 4
 All of the appellants argue that the District Court should have granted their motions for a judgment of acquittal on Counts I and II because the evidence does not support the jury's verdicts. When evaluating a claim of insufficient evidence, this Court considers "the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that might be drawn from the evidence." United States v. Fregoso, 60 F.3d 1314, 1322 (8th Cir.1995) (quoting United States v. Smith, 32 F.3d 1291, 1292 (8th Cir.1994)). We will reverse a conviction for insufficient evidence and order the entry of a judgment of acquittal only if no construction of the evidence exists to support the jury's verdict. United States v. Parker, 32 F.3d 395, 399 (8th Cir.1994).
 
 
 5
 In this case, the government charged all seven appellants with one count of conducting a criminal racketeering enterprise in violation of 18 U.S.C. Sec. 1962(c) (1988) (Count I) and one count of conspiring to conduct and participate in the same criminal racketeering enterprise in violation of 18 U.S.C. Sec. 1962(d) alleged in Count I (Count II). These activities were alleged to have taken place between April 1978 and September 1992. All seven appellants were convicted on Count I. The jury acquitted Noble Bennett on Count II but convicted the other six appellants.
 
 
 6
 To establish the elements of a substantive RICO offense (Count I), the government must prove (1) that an enterprise existed; (2) that the enterprise affected interstate or foreign commerce; (3) that the defendant associated with the enterprise; (4) that the defendant participated, directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendant participated in the enterprise through a pattern of racketeering activity by committing at least two racketeering (predicate) acts. United States v. Bennett, 44 F.3d 1364, 1374 (8th Cir.), cert. denied, --- U.S. ----, ----, 115 S.Ct. 2279, 2585, 132 L.Ed.2d 282, 833 (1995), and cert. denied, --- U.S. ----, 116 S.Ct. 98, 133 L.Ed.2d 52 (1995). To establish the charge of conspiracy to violate the RICO statute (Count II), the government must prove, in addition to elements one, two, and three described immediately above, that the defendant "objectively manifested an agreement to participate ... in the affairs of [the] enterprise." Id. (quoting United States v. Phillips, 664 F.2d 971, 1012 (5th Cir.1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 and 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982)). Proof of an express agreement is not required; "the government need only establish a tacit understanding between the parties, and this may be shown wholly through the circumstantial evidence of [each defendant's] actions." Fregoso, 60 F.3d at 1325.
 
 
 7
 Appellants argue that the evidence was insufficient to prove (1) the single enterprise charged by the government and (2) an enterprise with a structure distinct from the structure necessary to commit the predicate acts charged. Appellants Darden, Seals, Amerson, and Hopkins argue that the evidence is insufficient to prove that each of them was associated with the enterprise charged in the indictment. Appellant Lewis argues that the evidence is insufficient to prove that he managed, supervised, or directed the criminal racketeering enterprise charged in the indictment. We also address in this section a number of additional arguments concerning the sufficiency of the evidence as well as several related issues.
 
 A. Evidence of a Single Enterprise
 
 8
 Appellants argue that the evidence failed to establish the single enterprise charged in the indictment but instead established two parallel enterprises that eventually merged into a third enterprise. The government, on the other hand, argues that the JLO existed throughout the time frame alleged in the indictment and that other individuals, including Noble Bennett, associated with the JLO for specific, short-term criminal activities. The government concedes that during part of the time frame alleged in the indictment Noble Bennett headed his own criminal enterprise. After Bennett's enterprise failed, however, its members, including Bennett, joined the JLO. To determine whether multiple conspiracies exist when a single large conspiracy has been charged by the government, this Court considers the totality of the circumstances, "including the nature of the activities involved, the location where the alleged events of the conspiracy took place, the identity of the conspirators involved, and the time frame in which the acts occurred." United States v. Bascope-Zurita, 68 F.3d 1057, 1061 (8th Cir. Oct. 13, 1995). We conclude that the evidence overwhelmingly supports the conclusion that only one conspiracy existed throughout the time frame alleged in the indictment, although personnel varied.
 
 
 9
 The indictment in this case alleged that twenty-four named individuals (nine defendants, including the seven appellants, and fifteen unindicted co-conspirators) had associated in fact for the purpose of (1) obtaining an income from the distribution of cocaine, heroin, and marijuana; (2) protecting and preserving the distribution enterprise from competition and interference from law enforcement; and (3) promoting the enterprise and its activities. Superseding Indictment at 3. The indictment alleged that these individuals "committed acts of criminal racketeering" while engaging in interstate commerce and other activities affecting interstate commerce. These acts of racketeering included "(i) murder and acts and threats involving murder; (ii) [felony] act(s) involving dealing in narcotic and other dangerous drugs chargeable under state law ... and (iii) felonious ... dealing in narcotic and other dangerous drugs, punishable under any law of the United States." Id. at 2-3. The indictment also alleged that the enterprise achieved its purposes through (1) the possession and distribution of controlled substances; (2) the "possession, transfer, concealment and use of one or more firearms"; (3) the commission of murder, "act(s) involving murder, threat(s) involving murder," and attempts to conceal such acts and the identities of the responsible individuals from law enforcement officers; (4) "utilization of motels, digital paging devices, telephones, [and] two-way radios ... to facilitate (i) the distribution of [controlled substances]; (ii) the commission [and concealment] of ... murder or acts or threats involving murder; and (iii) the attempt to use, or the use of intimidation," to prevent a witness from testifying or "to hinder or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a federal offense." Id. at 3-4.
 
 
 10
 At trial, the government offered the testimony of several participants in the events alleged in the indictment to establish that the JLO constituted a single enterprise and that members of the Bennett enterprise joined the JLO during the time frame alleged in the indictment. One government witness, Rudy Weaver, joined the MSTA while in prison and learned that a group of MSTA members, including appellants Lewis, Williams, Amerson, and Darden, distributed drugs in the St. Louis area. Weaver recruited prospective members for the drug-dealing branch of the MSTA while in prison. After being released from prison, Weaver began selling cocaine in Kansas City. Some of the cocaine he sold was supplied by Ronnie Thomas, Lewis's first cousin and a St. Louis MSTA member. Weaver moved from Kansas City to St. Louis in the fall of 1987 and associated with members of the JLO. He called a pager to set up a meeting with Jerry Lewis at a Ponderosa restaurant in St. Louis. At a subsequent meeting attended by Williams, appellants Lewis and Hopkins agreed to supply Weaver and Williams with cocaine for resale. Cocaine deliveries occurred at a convenience store operated by Hopkins. At other times appellant Raymond Amerson or JLO member Gary Hamell delivered cocaine to Weaver.
 
 
 11
 As Weaver became a trusted member of the JLO, he learned about murders that had been carried out by members of the JLO, plans for future murders, and the JLO's sources for cocaine and distribution methods. Weaver testified that the purpose of this information sharing was to enable JLO members to sell cocaine more effectively, avoid apprehension, and defeat competitors. Weaver's testimony also established that the JLO continued operations through 1990 and even after many of its key members were arrested in January 1991 when the initial indictment in this case was handed down. The JLO's principal cocaine supplier, Juan Alfaro Gonzalez, delivered cocaine to Jerry Lewis in November 1990 and attempted to deliver four kilograms of cocaine to Weaver in February 1991. Weaver, however, was cooperating with authorities, and Gonzalez was arrested.
 
 
 12
 Ronnie Thomas, Lewis's first cousin, testified that he began selling heroin with Lewis sometime after September 1974. Thomas also testified that since at least April 1978 Lewis controlled the affairs of the drug distribution enterprise in which he participated. Like Weaver, Thomas stated that members of the JLO shared information to protect their drug trade, avoid apprehension, and defeat competitors. Thomas also testified that the group laundered money through legitimate businesses such as the Family Market and the Star and Crescent Market. Thomas repeatedly explained how the JLO resorted to murder to protect the organization and further its interests. Thomas also stated that the JLO would hold meetings immediately following a shooting to review what had happened.
 
 
 13
 Michael Lewis, Jerry Lewis's younger brother, testified that he became involved with the JLO in 1980-81 and participated in the management and sale of large quantities of T's and blues. He explained that Jerry Lewis directed the JLO's drug trade and that JLO members used pay phones and pagers to evade detection. Michael Lewis also testified that JLO members carried weapons and murdered people who they suspected were informants or whose interests they perceived to be adverse to the JLO.
 
 
 14
 Earl Parnell, one of Bennett's heroin distributors, testified that prior to 1988 he had delivered large quantities of heroin to Lewis, provided weapons to Lewis and his associates, and received cocaine for personal use and for redistribution from Lewis and his associates. Parnell described a "stash pad" used in 1981 by both the JLO and Bennett organizations to store cocaine, marijuana, and firearms. Parnell testified to other instances of cooperation between Bennett and Lewis prior to 1988. In May 1988, however, the relationship changed because Bennett's supplier was no longer able to deliver heroin. Bennett turned to the JLO for heroin and arranged to sell this heroin through George Noel, one of Bennett's dealers. Realizing that the substandard JLO heroin was not producing much of a profit, Bennett arranged to receive cocaine from Lewis. The Bennett enterprise thus became a distribution arm of the JLO during the late 1980s.
 
 
 15
 George Noel's testimony confirms Parnell's version of the merger of the JLO and the Bennett enterprise. Noel testified that sometime in the summer of 1987 members of the JLO, including Jerry Lewis, and members of Bennett's organization met at Bennett's house to discuss joining together to sell drugs. Thereafter Noel, who had been selling heroin for Bennett, started to receive his heroin through the JLO.
 
 
 16
 In addition to the evidence described above, the testimony of several other witnesses tends to prove that the JLO was a single enterprise throughout the time frame of the indictment and that the members of the Bennett organization joined the JLO to continue to profit from the sale of drugs after the Bennett organization was no longer viable. A narcotics investigator described the organizations as "intertwined" and "commingled extensively." Tr. vol. 28 at 42, 62. Participant-witnesses Noel and Gonzales also described a single organization throughout the relevant time frame. Even after the initial indictment was handed down and many JLO leaders were jailed, the JLO continued to function as a single enterprise and its remaining members took steps to keep the organization alive. These steps included making threats to the family of a cooperating witness, ordaining a sham MSTA minister to enable contact visits with Lewis, then in jail, so that Lewis could continue to direct JLO activities, and preparing a defense witness to commit perjury.
 
 
 17
 Viewing the evidence in the light most favorable to the government, as we must, we conclude that sufficient evidence was presented at trial to show that the JLO was a single enterprise throughout the time frame alleged in the indictment. "A single conspiracy may be found when the defendants share a common overall goal, ... even if the actors are not always the same." Bascope-Zurita, 68 F.3d at 1061. The evidence, including the reasonable inferences that can be drawn from the evidence, overwhelmingly supports the jury's verdict on this issue.
 
 B. Distinct Structure of the Enterprise
 
 18
 Appellants Darden, Hopkins, and Bennett argue that the government failed to prove the existence of an enterprise distinct from the structure necessary to commit the various predicate acts. The government argues that the evidence presented at trial sufficiently establishes the enterprise element of the RICO offenses charged in the indictment.
 
 
 19
 To prove the existence of an enterprise, the government must offer proof of (1) a common purpose; (2) a formal or informal organization of the participants in which they function as a unit ("some continuity of both structure and personality"); and (3) "an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity." United States v. Bledsoe, 674 F.2d 647, 664-65 (8th Cir.), cert. denied, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). Appellants apparently concede that the first two elements were established as they argue only that the government failed to prove a distinct, ascertainable structure. Bennett's Brief at 109; Darden's Brief at 50; Hopkins's Brief at 79. The government argues that, based on the evidence at trial, a reasonable jury could easily ascertain that the JLO had a distinct structure. We agree with the government. The evidence of the JLO's distinct structure is overwhelming.
 
 
 20
 To prove an ascertainable structure, the government need not introduce the enterprise's by-laws or certificate of incorporation. "Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir.1991) (emphasis in original) (internal quotation marks and citations omitted), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). While the government must prove both the pattern and enterprise elements, "the same piece of evidence may ... help to establish both." United States v. Indelicato, 865 F.2d 1370, 1384 (2d Cir.) (en banc), cert. denied, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). As we stated in United States v. Kragness,
 
 
 21
 it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity [such as a legitimate line of business], but rather that it has an existence beyond that which is necessary merely to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an ongoing basis is adequate to satisfy the separate existence requirement.
 
 
 22
 830 F.2d 842, 857 (8th Cir.1987).
 
 
 23
 As noted above, see supra pp. 1518-19, the Superseding Indictment charged the appellants with engaging in a pattern of racketeering that included three types of predicate acts: murders and attempted murders; dealing drugs in violation of state law; and dealing drugs in violation of federal law. In addition to proof of these acts, the government offered evidence of oversight and coordination activities sufficient to establish an ascertainable structure distinct from the structure needed to commit the predicate acts or to engage in the pattern of racketeering activities. Co-conspirators Weaver and Thomas testified that members of the JLO shared information to protect their drug trade, avoid apprehension, and defeat competitors. JLO leaders believed that this would help their members sell drugs more effectively. Thomas also testified that the JLO would hold post-shooting reviews to improve the techniques it employed to snuff out rivals and informants. Additionally, the evidence established that Jerry Lewis directed and oversaw the affairs of the JLO from the late 1970s until (and perhaps after) his incarceration in 1991. The government's evidence clearly establishes the ascertainable and distinct structure element of the RICO charges, and the jury's verdict on this element is thus supported by sufficient evidence.
 
 C. Membership in the Enterprise
 
 24
 Gerald Hopkins and Carlton Darden both assert that the District Court should have granted their motions for an acquittal because the government did not prove that they were members of the enterprise charged in the indictment. Hopkins argues that the government proved "mere association" but failed to show that he had any knowledge of the activities of the alleged drug enterprise. Darden makes no specific argument on this issue, and Carla Seals and Raymond Amerson adopt Darden's nonargument. Seals's Brief at 41; Amerson's Brief at 18-19. Despite these deficiencies of argument, however, we will consider the sufficiency of the evidence implicating each of these defendants in the activities of the JLO.
 
 
 25
 As noted above, see supra pp. 1517-18, the government had the burden to prove, inter alia, that each defendant associated with the enterprise; each defendant participated in the conduct of the affairs of the enterprise; each defendant participated in the enterprise through a pattern of racketeering activity; and, with respect to Count II only, each defendant objectively manifested an agreement to participate in the affairs of the enterprise. The jury found that the government had proved these elements beyond a reasonable doubt, and based on our review of the record we cannot say that the jury's verdict is unsupported by the evidence.
 
 
 26
 The following four subsections detail only a small part of the overwhelming evidence that supports the jury's verdicts on Counts I and II against Darden, Hopkins, Seals, and Amerson. The evidence demonstrates that each appellant associated with the JLO, participated in the conduct of the JLO's affairs through a pattern of racketeering activity, and manifested an agreement to participate in the JLO's affairs.
 
 1. Carlton Darden
 
 27
 Carlton Darden's brother-in-law, Michael Lewis, testified that Darden was criminally involved with Jerry Lewis in the early 1980s when Michael first joined the JLO. At that time, Darden was a leader in the T's and blues trade of the JLO, travelling to Detroit on one occasion to purchase a "vast amount" of T's. March 15, 1993 Tr. at 52. His involvement in the organization continued at least through early 1989. Lewis testified that Darden was still distributing cocaine in the spring of 1989, both in a housing complex called Cochran Gardens and at his job with the City of St. Louis Parking Meter Division. Lewis also testified that Darden had discussed purchases of cocaine from Rudy Weaver and that Darden believed Weaver might be an informant. Additionally, Lewis stated that $100,000 in cocaine-generated currency was stored by Jerry Lewis at Darden's house.
 
 
 28
 Rudy Weaver testified that Darden purchased cocaine from him, both for personal use and for distribution, from late 1987 through the summer of 1988. According to Weaver, Darden told Weaver that individuals who informed on the JLO ("snitches") would be killed. Darden well understood the JLO's potential for violent acts as he had participated in the attempted murder of rival drug dealer Lidell "Bud" Green and had shot Rochelle Bartlett at Jerry Lewis's behest, see infra pp. 1546-47, because Bartlett said that Lewis was informing on the JLO.
 
 
 29
 Darden's commitment to the goals of the JLO is evident from his willingness to follow Lewis's order to shoot Bartlett and his preoccupation with potential informants. Michael Lewis's testimony and the fact that Jerry Lewis entrusted Darden with large amounts of drug money are sufficient to prove Darden's association with the JLO. Darden's multiple drug deals in violation of state and federal law, using cocaine obtained through the JLO, sufficiently demonstrate his participation in the JLO through a pattern of racketeering activity. His trips to Detroit to purchase T's clearly manifest his agreement to participate in the conduct of the affairs of the JLO.
 
 2. Gerald Hopkins
 
 30
 Jerry Lewis called Gerald Hopkins "my little hitman," Tr. vol. 28 at 218, and the evidence supports Lewis's conclusion. Earl Parnell testified that both he and Hopkins were involved in the 1985 murder of a deputy sheriff. The deputy, Antar Tiari, was attempting to evict Jerry Lewis and the MSTA from its rented space in St. Louis, the same space from which the JLO conducted operations. Hopkins and Jerry Lewis, dressed in army fatigues, met with Parnell and Noble Bennett to plan the murder at Bennett's brother's auto shop. Lewis, Hopkins, Parnell, and Bennett returned to the auto shop after the murder, and Parnell testified that Hopkins said, "I shot that [expletive omitted]. Every time I hit him, he just jumped around and danced like this." Tr. vol. 28 at 218.
 
 
 31
 Rudy Weaver testified that Hopkins participated in the planning of the 1987 killing of Harold "Count" Johnson, a rival drug dealer, and Ronnie Thomas testified that Hopkins helped to plan the 1988 killing of Ronald Anderson. Hopkins also generally was present at the JLO's information-sharing meetings.
 
 
 32
 Ronnie Thomas also testified that Hopkins participated in the JLO's March 28, 1988 surveillance of Billy Patton, a rival drug dealer who was eventually killed. Andrea Patton, Billy Patton's niece, was rendered a quadriplegic when the car she was driving was riddled with bullets. She had left her uncle's apartment in the car, and both Thomas and Michael Lewis testified that JLO members shot at the car in the mistaken belief that Billy Patton was inside. Lewis testified that Hopkins fired the shots.
 
 
 33
 The evidence of Hopkins's involvement in the JLO's drug trade is also extensive. Michael Lewis explained that the feud between the JLO and Billy Patton's organization stemmed from Hopkins's dealing of Lewis-supplied cocaine in the same area in which Patton was distributing cocaine. Hopkins apparently was undercutting Patton's prices. When Rudy Weaver returned to drug dealing in St. Louis, Hopkins and Jerry Lewis met with him at a Ponderosa restaurant and agreed to supply him with cocaine. Weaver later picked up cocaine from Hopkins at a convenience store managed by Hopkins. Additionally, the jury found that the government had proven, through the testimony of law enforcement officers and others, that Hopkins had possessed cocaine with the intent to distribute on June 28, 1987, and May 3, 1988. The jury also found that he had possessed cocaine on February 28, 1988, and April 25, 1988. The record supports the jury's findings on all of these charges. Thus Hopkins's argument that the government failed to prove that he had knowledge of the JLO's activities is specious.
 
 3. Carla Seals
 
 34
 Carla Seals was Gerald Hopkins's girlfriend during much of the time frame alleged in the indictment. Rudy Weaver testified that if Gerald Hopkins was not at the convenience store where Weaver picked up cocaine, Seals would have Hopkins's pager. Weaver and Earl Parnell both testified that at least twice Seals had dealt cocaine to them. Parnell testified that he arranged the purchases through Jerry Lewis. Weaver also testified that Seals went to Chicago to pick up cocaine for Lewis on two separate occasions. Additionally, Michael Lewis testified to Seals's involvement in the JLO's cocaine trade. Seals stored cocaine at her house and, along with Lewis, Weaver, and others, broke kilos of cocaine down into one-ounce units. Michael Lewis, during questioning by Seals's counsel, testified that "whenever Carla was told to distribute cocaine to myself or Greg or whomever, she did." Tr. vol. 55 at 173.
 
 
 35
 In addition to the drug-related activities described above, the jury specifically found that Seals possessed cocaine with intent to distribute on June 28, 1987, when she was arrested with Hopkins. The evidence supports this finding. During a valid search, law enforcement officers recovered nine bags of cocaine in a pouch that matched Seals's purse. Seals admitted her possession of the cocaine in a state court proceeding, and the fact that the cocaine was divided into nine separate bags is sufficient evidence from which a jury could infer intent to distribute.
 
 
 36
 Seals was also involved in the murders of Ronald Anderson and Billy Patton, a rival cocaine dealer, and the post-murder review session following the death of Brian Hall. Ronnie Thomas testified that Seals attended the meeting where the JLO planned the shooting of Anderson. She also delivered the murder weapon to the location where the assassin, Thomas, obtained it later that night. Michael Lewis testified that Seals helped locate Billy Patton by introducing Jerry Lewis to Patton's sister-in-law, who then gave Lewis "pertinent information on Billy." Tr. vol. 54 at 97. Ronnie Thomas further testified that Seals, along with Jerry Lewis and Amerson, attended a meeting following the murder of Brian Hall where the procedures used to carry out the killing were reviewed.
 
 
 37
 We conclude that the evidence is sufficient to show that Seals was a knowing member of the criminal enterprise.
 
 4. Raymond Amerson
 
 38
 Amerson's criminal association with Jerry Lewis dates at least to the early 1980s. Michael Lewis, Jerry Lewis's brother and Carlton Darden's brother-in-law, testified that Amerson was a part of the JLO when he joined in 1980 or 1981 and that Amerson was selling large amounts of T's and blues. Rudy Weaver testified that Amerson asked Weaver to recruit drug dealers from the prison in which Weaver was then incarcerated. Weaver also testified that, after Weaver had been released from prison, Amerson taught him how to create a "spot" in his car to hide drugs and guns and that Amerson actually installed such a spot in Weaver's car. This was done behind the MSTA building. According to Weaver, Amerson laundered drug money, received large amounts of cocaine, and broke down kilos of cocaine for redistribution at the JLO-managed Star and Crescent Market in 1988 and 1989. During that same time frame, Amerson travelled to Atlanta to pick up cocaine from a JLO source.
 
 
 39
 Amerson was also involved in the violent activities of the JLO. Ronnie Thomas testified that Amerson was involved in the elimination and intimidation of witnesses planning to testify against members of the JLO. Amerson, along with Michael Williams and Jerry Lewis, participated in the pre-killing surveillance of intended victims. Michael Lewis and Earl Parnell testified that Amerson shot and killed Bruce "Hat" Henry and either killed or participated in the killing of Harold "Count" Johnson, both loyal associates of rival drug dealer Lidell "Bud" Green. Lewis and Parnell also testified that Amerson murdered Billy Patton, a drug dealer who competed with the JLO, in late January 1989. After the killing, Amerson and other JLO members gathered at Jerry Lewis's house, toasted Patton's death, and laughed about the murder.
 
 
 40
 In sum, the evidence is clearly sufficient to show that Darden, Hopkins, Seals, and Amerson associated with the JLO, agreed to participate in the affairs of the JLO, and participated in the conduct of the JLO's affairs through patterns of racketeering activity.
 
 D. Other Sufficiency Arguments
 
 41
 Several appellants argue that the government did not sufficiently plead and did not prove a pattern of racketeering activity because it failed to prove at least two predicate acts within the five-year statute of limitations. We reject all of these contentions, addressing below only those issues properly briefed.
 
 
 42
 Carlton Darden and Noble Bennett both argue, without any citation to authority, that the narcotics conspiracy[4] charged by the government as a predicate act in Counts I and II of the Superseding Indictment is identical to the RICO conspiracy and, as such, is not a proper predicate act under the statute. The Superseding Indictment charges that the appellants conspired to possess, distribute, and possess with the intent to distribute cocaine, heroin, marijuana, and pentazocine in violation of federal and state law. The elements of this offense differ from the elements of the RICO offenses charged by the indictment, see supra pp. 1517-18, and this offense clearly constitutes a predicate act under the RICO statute, see 18 U.S.C. Sec. 1961(1)(A), (D) (1988). Cf. United States v. Scarpa, 913 F.2d 993, 1008 (2d Cir.1990) (holding that narcotics conspiracy had sufficient nexus with RICO charges to serve as predicate act). The jury found that the government proved beyond a reasonable doubt that Lewis, Seals, Amerson, Bennett, Darden, and Williams had engaged in a narcotics conspiracy that continued from 1978 to 1992. The jury's verdict is supported by the great weight of the evidence, and thus this assignment of error does not provide a basis for relief for any of the appellants.
 
 
 43
 Darden and Bennett also argue that the government failed to prove that they engaged in a pattern of racketeering activity, one of the essential elements of a RICO offense. In Bennett's case, the jury found that the government had proved beyond a reasonable doubt that Bennett was involved in the JLO's narcotics conspiracy, that he possessed cocaine on three separate occasions, and that he possessed cocaine with the intent to distribute cocaine on one occasion. The evidence is sufficient to support the jury's findings on these charges. Bennett's primary argument is that simple possession of cocaine cannot serve as a predicate act under the RICO statute. We agree. The statute specifically lists a number of drug-related offenses that constitute predicate acts for purposes of the RICO statute. See 18 U.S.C. Sec. 1961(1)(A), (D) (1988). Applying the time-honored rule of inclusio unius est exclusio alterius (the inclusion of one is the exclusion of another), it is apparent to us that mere possession is not a predicate act under the RICO statute. Bennett, however, is not aided by this argument. A pattern of racketeering activity consists of at least two predicate acts, although two may not be sufficient. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). In this case, however, Bennett's two predicate acts (participating in the narcotics conspiracy and possession with intent to distribute), along with the other evidence of Bennett's intimate participation in the JLO, see supra pp. 1519-20, conclusively establish that Bennett engaged in the pattern of racketeering activity charged by the government.
 
 
 44
 In Darden's case, he argues that the evidence was insufficient to prove a pattern of racketeering activity. While RICO may not be broad enough to encompass the actions of every defendant who commits two proscribed racketeering acts, we think that Darden's involvement in the attempted murders of Rochelle Bartlett and Lidell "Bud" Green, his possession with the intent to distribute cocaine on numerous occasions from 1987 to 1989, and his leadership in the T's and blues trade, each of these activities having been established by sufficient evidence at trial, constitute a pattern of racketeering activity within the meaning of the RICO statute. The acts are all related to his participation in the JLO, and they represent a consistent desire to further the JLO's activities.
 
 
 45
 In addition to these arguments, Darden adds the contention that his prosecution was barred by the general federal five-year statute of limitations, 18 U.S.C. Sec. 3282 (1988), which is applicable to prosecutions brought under the RICO statute, United States v. Vogt, 910 F.2d 1184, 1195 (4th Cir.1990), cert. denied, 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). A prosecution under Sec. 1962(c) (Count I) is barred by the statute of limitations unless the defendant committed a predicate act within five years of the indictment. United States v. Salerno, 868 F.2d 524, 534 (2d Cir.), cert. denied, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 and 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24, 25 (1989). In a prosecution under Sec. 1962(d) (Count II), an indictment is timely if the conspiracy had not accomplished or abandoned its objectives more than five years before the date of the indictment. United States v. Rastelli, 870 F.2d 822, 838 (2d Cir.), cert. denied, 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989). Because we conclude above that sufficient evidence supports the jury's finding that Darden committed a predicate act, possession with intent to distribute cocaine, as late as 1989, his statute-of-limitations arguments are foreclosed. The original indictment in this case was returned by the Grand Jury on January 9, 1991, only two years after Darden had committed a predicate act in furtherance of the JLO's continuing RICO conspiracy.
 
 
 46
 Like Darden, Carla Seals argues that the government failed to produce sufficient evidence of predicate acts to prove that she engaged in the charged pattern of racketeering activity. The jury found that Seals had possessed cocaine with the intent to distribute it on June 28, 1987, and that she participated in the JLO's narcotics conspiracy. The evidence supports the jury's findings. These two predicate acts, along with the other evidence of Seals's involvement with the JLO, see supra pp. 1522-23, establish the requisite pattern of racketeering activity.
 
 
 47
 Gerald Hopkins argues that the evidence was insufficient to prove that he participated in the attempted murder of Andrea Patton. Even if we were to agree with Hopkins, the government still proved that Hopkins engaged in a pattern of racketeering activity. On appeal Hopkins does not challenge the jury's findings that he possessed cocaine with the intent to distribute it on June 28, 1987, and May 3, 1988; conspired to murder and murdered Deputy Sheriff Antar Tiari; and conspired to murder Gerald Patton. Even so, we hold that the evidence is sufficient to prove that Hopkins attempted to murder Andrea Patton. Hopkins claims that only the incredible testimony of Ronnie Thomas links Hopkins with the crime. Credibility is, of course, a matter within the province of the jury, and there is nothing in the record that would show Thomas's testimony to be inherently incredible. Moreover, Hopkins's assertion is patently false. Michael Lewis testified that Hopkins fired shots at the car in which Andrea Patton was riding. The testimony of Thomas and Lewis thus establishes Hopkins's participation in the attempted murder of Andrea Patton.
 
 
 48
 Finally, Jerry Lewis argues that "the government failed to show that [Lewis] managed, supervised or directed a RICO enterprise through a pattern of racketeering activity." Lewis's Brief at 136. This argument actually consists of three separate arguments: (1) the evidence was insufficient to show a pattern of racketeering activity; (2) the evidence was unfairly obtained through plea bargains; and (3) the evidence does not satisfy the direction test of Reves v. Ernst & Young, 507 U.S. 170, 178-80, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993). The latter two arguments are addressed elsewhere in this opinion. See infra pp. 1548-49, 1541-43. Lewis's sufficiency argument is specious. The evidence overwhelmingly supports the jury's findings that Lewis conspired to possess, distribute, and possess with the intent to distribute cocaine, heroin, marijuana, and pentazocine in violation of federal and state law; possessed pentazocine with the intent to distribute it on three occasions; possessed cocaine with the intent to distribute it on one occasion; aided and abetted the distribution of cocaine in November 1990; conspired and attempted to murder Rochelle Bartlett; conspired and attempted to murder "Bud" Green; conspired to murder and murdered Deputy Sheriff Antar Tiari; conspired to murder and murdered Bruce "Hat" Henry; conspired to murder and murdered Count Johnson; and conspired to murder and murdered David "Kiki" Grady. All of these predicate acts were committed in furtherance of the JLO's interests, and they conclusively establish that Lewis engaged in a pattern of racketeering activity.
 
 E. Related Issues
 1. Severance
 
 49
 Appellants Bennett, Darden, Seals, and Williams argue that the District Court erred when it refused to sever each of their trials from the trial of their co-defendants.[5] "[W]e review the district court's denial of a motion for severance for an abuse of discretion," Fregoso, 60 F.3d at 1328, and will reverse only when that abuse of discretion results in "severe or compelling prejudice," United States v. Rimell, 21 F.3d 281, 289 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 453, 130 L.Ed.2d 362 (1994). When a defendant moves for a severance, a district court must first determine whether joinder is proper under Federal Rule of Criminal Procedure 8. If joinder is proper, the court still has discretion to order a severance under Federal Rule of Criminal Procedure 14. These rules are to be "liberally construed in favor of joinder." Rimell, 21 F.3d at 288.
 
 
 50
 Appellants argue that joinder was improper under Rule 8 or, alternatively, that the District Court abused its discretion by refusing to sever their trials pursuant to Rule 14. Bennett, Darden, Seals, and Williams contend that they were prejudiced by the "spillover" effect of overwhelming evidence presented solely against their co-defendants. Darden also claims that the joint trial deprived him of relevant testimony of co-defendant Bennett.
 
 
 51
 Joinder was unquestionably proper under Rule 8.[6] The indictment in this case sufficiently alleged that the joined defendants and counts were factually interrelated. See United States v. Jones, 880 F.2d 55, 62-63 (8th Cir.1989). "[I]t is not necessary that every defendant have participated in or be charged with each offense." Id. (quoting United States v. O'Connell, 841 F.2d 1408, 1431 (8th Cir.), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988) and 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989)). Under Rule 14, a district court may sever a defendant's trial from the trial of co-defendants "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment ... or by such joinder for trial together." When joinder is proper under Rule 8, the defendant seeking a severance has the burden to demonstrate how the joint trial prejudiced his or her right to a fair trial. United States v. Penson, 62 F.3d 242, 244 (8th Cir.1995); see also United States v. Lane, 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986).
 
 
 52
 At best, the appellants' allegations of prejudice are speculative. Williams, for example, argues that the defendants advanced conflicting defense theories and implicated other defendants. Williams, however, has not explained how the defenses of the other defendants were in conflict with his own defense. Even the "existence of generally antagonistic defenses does not necessitate a severance." Jones, 880 F.2d at 63. Having failed to show the existence of any antagonistic defenses, Williams has not shown that joinder was prejudicial as the result of such defenses.
 
 
 53
 Bennett, Seals, and Williams contend that only a small part of the evidence implicated them in the activities of the JLO and that such a disparity of evidence resulted in a "spill-over" effect that was prejudicial. Their argument is fatally flawed, however, because they gloss over the fact that they were indicted as members of a RICO conspiracy that included all of their co-defendants. Each defendant may be held accountable for actions taken by other defendants in furtherance of the conspiracy, and thus all of the evidence offered at trial relating to the activities of the JLO, regardless of whether Bennett, Darden, Seals, and Williams directly participated in those activities, would be admissible against them if they had been given separate trials. See United States v. Garver, 809 F.2d 1291, 1298 (7th Cir.1987); United States v. Hattaway, 740 F.2d 1419, 1424 (7th Cir.), cert. denied, 469 U.S. 1028, 1089, 105 S.Ct. 448, 599, 83 L.Ed.2d 373, 708 (1984).
 
 
 54
 Darden's argument that he was deprived of co-defendant Bennett's testimony is also unsupported by a sufficient showing of prejudice. To be entitled to a severance based on the unavailability of testimony of a co-defendant, a defendant must show that the testimony, otherwise lost due to the co-defendant's assertion of the Fifth Amendment privilege against self-incrimination, would be substantially exculpatory. United States v. DeLuna, 763 F.2d 897, 920 (8th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). To be substantially exculpatory, the testimony must "do more than merely tend to contradict a few details of the government's case." United States v. Oakie, 12 F.3d 1436, 1441 (8th Cir.1993). In this case Darden offered Bennett's affidavit to show what Bennett's testimony would be if Darden had been tried separately. The affidavit, which relates to the shooting of Rochelle Bartlett, only states that Bennett was at the scene of the crime and did not see Darden either before or after the shooting. The affidavit does not indicate that Bennett saw the shooting or the shooter. The affidavit thus does not even contradict the evidence offered by the government that tended to show that Darden was the shooter; it falls far short of showing that Bennett's testimony would be "substantially exculpatory."
 
 
 55
 The United States has a strong interest in the joint trial of the members of a criminal enterprise. Such trials save time and money for the courts, prosecutors, and witnesses. Most importantly, however, justice is best served by trying the members of a racketeering enterprise together because a joint trial "gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." United States v. Buljubasic, 808 F.2d 1260, 1263 (7th Cir.), cert. denied, 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987). Because the appellants have failed to show that they were prejudiced in any way by the joint trial of this case, the government's interest in trying them together obviously outweighs the appellants' interest in separate trials. The District Court thus did not abuse its discretion by denying their motions for severances.
 
 2. Admission of Co-conspirators' Statements
 
 56
 Citing United States v. James, 590 F.2d 575 (5th Cir.), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), Noble Bennett, Jerry Lewis, and Michael Williams argue that the District Court abused its discretion when it permitted the government to present the statements of alleged co-conspirators to the jury without holding a preliminary hearing to determine the admissibility of the statements. The government argues that this Court does not require a preliminary hearing to determine the admissibility of co-conspirator statements. We agree. The appellants' reliance on James is misplaced. In Llach v. United States, we specifically declined to adopt the Fifth Circuit's procedure, which requires the government to prove by a preponderance of the evidence, prior to the admission of co-conspirators' statements, that a conspiracy exists. 739 F.2d 1322, 1328-29 (8th Cir.1984). United States v. Reda, 765 F.2d 715 (8th Cir.1985), is not to the contrary. In Reda, we merely noted that a district court may choose to hold a preliminary hearing rather than conditionally admitting the statements prior to the government's proof of a conspiracy. Id. at 721-22. The choice of the procedure, however, remains within the discretion of the trial court, id. at 722, and the court in this case did not abuse its discretion when it refused to hold a preliminary hearing.
 
 
 57
 Appellants also argue that the court erred when it admitted the statements because they are not co-conspirator's statements, admissible under Federal Rule of Evidence 801(d)(2)(E), and otherwise consist of inadmissible hearsay. While these appellants appear to challenge a number of statements, their briefs specifically identify only two sets of statements. Failure to identify the objectionable statements hampers this Court's ability to review the District Court's rulings on those statements. We therefore will review only the admissibility of the statements specifically identified in the appellants' briefs.
 
 
 58
 "We review the evidentiary rulings of a district court only for abuses of discretion, and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." United States v. Ballew, 40 F.3d 936, 941 (8th Cir.1994) (citations omitted), cert. denied, --- U.S. ----, 115 S.Ct. 1813, 131 L.Ed.2d 737 (1995).
 
 
 59
 First, Bennett argues that Parnell's testimony regarding Bennett's attempt to secure a kilogram of cocaine from Lewis is inadmissible hearsay. Parnell, however, was recounting statements Bennett made directly to him. These statements thus were clearly admissible, at least against Bennett, because they were Bennett's own statements. See Fed.R.Evid. 801(d)(1)(A). Bennett does not have standing to argue that Parnell's statements were inadmissible against any other defendants. Darden, however, adopts Bennett's argument, and we therefore will analyze these statements under the co-conspirator rule below. Second, Lewis argues that the audio recordings of conversations between Willie Dixon and Earl Parnell were inadmissible. The conversations took place between November 1988 and January 1989 and were recorded by Parnell. At the time, Parnell was a government informant and Dixon was allegedly a participant in the JLO conspiracies that involved, among others, Bennett, Williams, and Lewis.
 
 
 60
 The government argues that Parnell's testimony and the audio recordings consist of statements of co-conspirators, which are not hearsay. See Fed.R.Evid. 801(d)(2)(E). For a statement to be admissible under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence (1) that a conspiracy existed, (2) that the declarants were co-conspirators of the defendants, and (3) that the statements were made during the course of and in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 175-76, 107 S.Ct. 2775, 2778-79, 97 L.Ed.2d 144 (1987); United States v. Jackson, 67 F.3d 1359, 1364 (8th Cir.1995). We have already concluded that the government proved beyond a reasonable doubt that a single conspiracy to violate the RICO statute existed.[7] See supra pp. 1520-21. Moreover, none of the appellants appear to challenge the jury's findings that they were involved in the narcotics conspiracy that served as one of the predicate acts of the RICO conspiracy. We have also held that Noble Bennett and Jerry Lewis were members of the RICO conspiracy and participated in it through a pattern of racketeering activity, see supra pp. 1524-25, 1525-26, and Williams does not argue that he was not a member of the JLO or the narcotics conspiracy. Thus we need only decide whether the declarants were members of the same conspiracies and whether the statements admitted were made during the course of and in furtherance of the conspiracies.
 
 
 61
 Darden, by adopting Bennett's argument, challenges the admissibility of statements made by Bennett. The government proved, as we noted above, that Bennett was a member of the conspiracy charged by the indictment. The government also proved by a preponderance of the evidence that his statements were made during the course of and in furtherance of the conspiracy. Specifically, on December 10, 1988, Bennett told Parnell that he was trying to obtain a kilogram of cocaine from Jerry Lewis and that he wanted Parnell to "work with him" on that transaction. Tr. vol. 29 at 112-15. As the Superseding Indictment charged a narcotics conspiracy headed by Jerry Lewis between 1978 and 1992, Bennett's argument that his statements were not made during the course of or in furtherance of the conspiracy is specious.
 
 
 62
 Lewis challenges the admissibility of tape recordings of conversations between Willie Dixon and Earl Parnell. For the recordings to be admissible under Rule 801(d)(2)(E), the only basis for admissibility argued by the government, the declarants on these tapes, Dixon and Parnell, both must be co-conspirators of the defendants. Additionally, they must both be making their statements during the course of and in furtherance of the conspiracy. The government's evidence clearly showed that Dixon was a member of the single conspiracy charged in the Superseding Indictment. His statements were properly admitted under Rule 801(d)(2)(E) because his participation in the ongoing conspiracy continued and because his statements were in furtherance of the conspiracy. The furtherance requirement is interpreted broadly. United States v. Edwards, 994 F.2d 417, 422 (8th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 701, 126 L.Ed.2d 667 (1994). While Lewis characterizes much of the information on the recordings as "gossip," Lewis's Brief at 100, statements that describe past events are in furtherance of the conspiracy if they are made to plan future activities, United States v. Haldeman, 559 F.2d 31, 110-11 (D.C.Cir.1976) (holding that narrations of past events were in furtherance of conspiracy because presidential aides involved were required to make "regular strategic decisions on how best to proceed" with cover-ups, which included review of "what had taken place to identify and shore up the loose ends"), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), or simply to keep co-conspirators abreast of current developments and problems facing the group, United States v. Massa, 740 F.2d 629, 638 (8th Cir.1984) (holding that statements made to "explain events important to the conspiracy or give directions to facilitate it" were in furtherance of conspiracy), cert. denied, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). Because Lewis has made no more specific attack on these statements than calling them "gossip," and "gossip" is not inadmissible per se, we can only conclude that the District Court did not abuse its discretion by admitting Dixon's statements.
 
 
 63
 Earl Parnell, however, was on the same tape recordings. His statements are not admissible under Rule 801(d)(2)(E) because he was a government informant rather than a co-conspirator at the time the statements were made and, obviously, the statements were not made in furtherance of the conspiracy. See United States v. Smith, 578 F.2d 1227, 1233 (8th Cir.1978) (holding inadmissible under Rule 801(d)(2)(E) statements of co-conspirator turned government informant made after declarant agreed to assist government because declarant was no longer member of conspiracy). The District Court abused its discretion by admitting Parnell's statements. Nonetheless, this error does not require us to reverse either Lewis's convictions or the convictions of Carlton Darden, who adopted Lewis's arguments on this issue. Criminal defendants are "entitled to a fair trial, not a perfect one." Id. at 1234 (quoting, inter alia, Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953)). In light of the overwhelming evidence of Lewis's and Darden's guilt, we do not hesitate to hold that the admission of Parnell's statements on the Parnell-Dixon recordings did not affect the substantial rights of either appellant. See Ballew, 40 F.3d at 941; see also Fed.R.Crim.P. 52(a) ("Any error ... which does not affect substantial rights shall be disregarded.").
 
 II.
 
 64
 Several appellants argue that the District Court improperly handled a number of jury-related trial procedures. Specifically, appellants argue that the court erred when it (1) permitted the government to use a peremptory challenge in a racially discriminatory manner; (2) empaneled an anonymous jury; (3) employed additional security measures at trial; (4) refused to strike for cause Juror 66 during the trial; (5) refused to recuse itself when a newspaper article quoted the court as saying the life of a government witness was in danger and improperly questioned the jury collectively regarding the article; and (6) permitted the jurors to take notes when viewing exhibits but not during other phases of the trial. We will address each of these issues in turn.
 
 
 65
 A. Use of Peremptory Challenge to Exclude Juror 99
 
 
 66
 During voir dire the government used one of its peremptory challenges to strike Juror 99, a young black woman. Defense counsel objected to this challenge as an unconstitutional, racially discriminatory use of a peremptory challenge. The District Court asked the prosecutor if he wished to respond to the objection, and the prosecutor offered the following explanation for the exercise of the challenge:
 
 
 67
 And 99 I note for the record is the youngest individual or at least one of the youngest individuals. She is a black female, she's single, she has a 17 month old child and I believe she rents. She said virtually nothing. As a matter of fact, my records indicate she said nothing in voir dire. I struck, for the record, jurors number 91 and number 93, also females, who also said virtually nothing, if at all, said nothing during voir dire. It has been my experience in picking well over 200 juries in the criminal justice system that those people who don't answer questions are either naive or withholding information or have had virtually no experience with the criminal justice system and as such, they tend to be a lot more naive and a lot less knowledgeable about the events and the happenings on the street involving street crimes which is what we're talking about right here.
 
 
 68
 Oct. 27, 1992 Tr. at 57-58. The prosecutor then continued, stating that
 
 
 69
 I note for the record in my own experience that young black females have a penchant, have a tendency--and I have noted throughout in my trials, over forty or fifty jury drug related trials--tend to testify on behalf and be more sympathetic toward individuals who are involved in narcotics, either because of emotional attachment or family attachment or attachment as a result of financial gains or financial benefits as a result of their relationship with drug dealers.
 
 
 70
 Id. at 58. The court allowed the strike, and the next day it explained its decision to do so, stating that
 
 
 71
 I believe the record is clear enough, but I just wanted to double check. On one of the strikes yesterday I commented that Mr. Hoag's reason for striking a young black woman was not a racially neutral reason and I still say that, that is not a racially neutral reason, but the other reasons you expressed give cause that are non-racially--they are racially neutral--the other reasons you stated.... For that reason I'm allowing the strike.... [T]he other reasons you gave give the basis for being a strike.
 
 
 72
 Tr. vol. 1 at 1-2. Several appellants contend that the court erred when it allowed the government to strike Juror 99 from the pool of potential alternate jurors.
 
 
 73
 In Batson v. Kentucky, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." The Court later held that "gender, like race, is an unconstitutional proxy for juror competence and impartiality." J.E.B. v. Ala. ex rel. T.B., --- U.S. ----, ----, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994). If a party exercises a peremptory challenge in part for a discriminatory purpose, a trial court must decide "whether the party whose conduct is being challenged has demonstrated by a preponderance of the evidence that the strike would have nevertheless been exercised even if an improper factor had not motivated in part the decision to strike." Jones v. Plaster, 57 F.3d 417, 421 (4th Cir.1995) (internal citation omitted); see also Howard v. Senkowski, 986 F.2d 24, 26-30 (2d Cir.1993). If so, the peremptory challenge is not subject to constitutional attack. A district court's finding on whether a peremptory challenge was exercised for a racially discriminatory reason is reversed only if clearly erroneous. Jones, 57 F.3d at 421 (citing Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991)). "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' " Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869 (quoting Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985)).
 
 
 74
 In this case the prosecutor stated several race-neutral and gender-neutral reasons for striking Juror 99 before adding one reason that was not race or gender neutral. He also stated that the most important reason for striking the juror was "her inexperience." Tr. vol. 1 at 2. The District Court found that the statement regarding the tendency of young black women to sympathize with drug dealers was not racially neutral but that the other reasons were, and that those other reasons formed the basis for the strike. The court noted that the prosecutor had struck two other jurors who also said virtually nothing during voir dire, both of whom were white.[8] The court's decision to allow the strike on the basis of the several racially neutral reasons was equivalent to a finding that the prosecutor would have exercised the strike even without the one non-racially neutral motive. The District Court was in the best position to judge the motives of the prosecutor, and the record reveals that the court did so carefully, taking note of the several reasons offered for the challenge and expressly finding that the racially neutral reasons formed a valid basis for the government's use of the peremptory challenge. We cannot say that in so doing the court clearly erred.
 
 B. The Anonymous Jury
 
 75
 Appellant Bennett contends that the District Court erred by empaneling an anonymous jury. Bennett argues that the court's decision not to disclose the names of venirepersons created the impression that the defendants were dangerous, thereby biasing the jurors and depriving the defendants of their Sixth Amendment right to a trial by an impartial jury. We disagree.
 
 
 76
 Whether a court may empanel an anonymous jury is an issue that this Court has not thoroughly analyzed in any prior opinion.[9] We recognize the danger that the use of an anonymous jury could prejudice the jurors against the defendants. Nevertheless, every court that has considered the issue has concluded that in appropriate circumstances the empanelment of an anonymous jury does not infringe on the right to an impartial jury. See, e.g., United States v. Edmond, 52 F.3d 1080, 1090-91 (D.C.Cir.1995); United States v. Ross, 33 F.3d 1507, 1519 (11th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995); United States v. Thornton, 1 F.3d 149, 154 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993); United States v. Crockett, 979 F.2d 1204, 1215-17 (7th Cir.1992), cert. denied, 507 U.S. 998, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993); United States v. Paccione, 949 F.2d 1183, 1191-93 (2d Cir.1991), cert. denied, 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992). The Second Circuit has held that generally a court should not empanel an anonymous jury without "a) concluding that there is strong reason to believe the jury needs protection, and b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." Paccione, 949 F.2d at 1192. We adopt these guidelines, as have two of our sister circuits. Edmond, 52 F.3d at 1090; Ross, 33 F.3d at 1520. Within these parameters, a district court's decision is reviewed under the deferential abuse-of-discretion standard. Ross, 33 F.3d at 1519; Paccione, 949 F.2d at 1192.
 
 
 77
 The District Court did not abuse its discretion by determining that the jurors in this case needed the protection of anonymity. In Ross, the Eleventh Circuit summarized its review of the case law concerning this issue by stating that
 
 
 78
 [s]ufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including: (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.
 
 
 79
 Ross, 33 F.3d at 1520. Several cases have approved the use of an anonymous jury because of the presence of some combination of these factors. See Edmond, 52 F.3d at 1091; Ross, 33 F.3d at 1520-21; Crockett, 979 F.2d at 1216; Paccione, 949 F.2d at 1192-93. In this case, all five of the factors were present.[10] Each of the nine defendants was charged with participating in an extraordinarily violent organized criminal enterprise. The enterprise had many members and associates who remained at large throughout the trial. The enterprise had an extensive history of conflict with the criminal justice system, including the intimidation and murder of government witnesses. Several of the defendants had criminal records including convictions for violent crimes such as armed robbery, rape, and murder. All the defendants faced possible sentences of life in prison. The case was so highly publicized in St. Louis that some defendants filed motions for a change of venue. The District Court thus had ample reason to conclude that the jurors in this case needed the protection of anonymity.
 
 
 80
 We also note that the District Court took reasonable precautions to ensure that the empanelment of an anonymous jury would not result in undue prejudice against the defendants. The court told the venirepersons that they were being identified by numbers rather than their names so that members of the media would not ask them questions. This approach has been approved by the Second Circuit several times. See Paccione, 949 F.2d at 1193; United States v. Ferguson, 758 F.2d 843, 854 (2d Cir.), cert. denied, 474 U.S. 841, 1032, 106 S.Ct. 124, 125, 592, 88 L.Ed.2d 102, 572 (1985); United States v. Thomas, 757 F.2d 1359, 1365 (2d Cir.), cert. denied, 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985) and 479 U.S. 818, 107 S.Ct. 78, 93 L.Ed.2d 34 (1986). Furthermore, "[w]here jury anonymity is warranted, the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias toward issues in the case or to the defendant himself." Ross, 33 F.3d at 1520. Our review of the record satisfies us that a thorough voir dire was conducted in this case. For the foregoing reasons, we conclude that the District Court did not abuse its broad discretion by empaneling an anonymous jury.
 
 
 81
 C. Additional Security Measures at the Trial
 
 
 82
 Appellant Amerson contends that other security measures implemented by the District Court during the trial also created the impression that the defendants were dangerous, thereby depriving the defendants of their right to an impartial jury. Amerson cites the following security measures in particular: (1) the large number of security personnel in the courtroom; (2) the two magnetometers through which entrants to the courtroom had to pass; (3) inspections of the belongings of defense attorneys, initially within view of arriving jurors; (4) the assembling of the jury in a secret location; and (5) the transportation of the jurors and the defendants to and from the Courthouse in vans operated by the United States Marshal for the Eastern District of Missouri, with additional security including armed guards along the street, a convoy of police vehicles, helicopter surveillance, and snipers on the roof of the United States Court and Custom House in St. Louis.
 
 
 83
 It is possible for security measures employed during a trial to be so "inherently prejudicial" that they deprive a defendant of the right to an impartial jury. Holbrook v. Flynn, 475 U.S. 560, 570, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). Nevertheless, not all security measures singling out the accused as potentially dangerous are unconstitutionally prejudicial. "We have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct." Id. at 567, 106 S.Ct. at 1345. "A trial court's security decisions must be accorded broad discretion and may be reversed only for abuse." Hellum v. Warden, United States Penitentiary-Leavenworth, 28 F.3d 903, 907 (8th Cir.1994). "Further, the burden of affirmatively demonstrating prejudice from security measures is on the defendant." United States v. Williams, 897 F.2d 1430, 1434 (8th Cir.1990).
 
 
 84
 Having reviewed the record, we conclude that the District Court did not abuse its broad discretion to determine what security provisions to employ during a trial. As discussed above, see supra p. 1532, each of the nine defendants in this case was charged with participating in an extraordinarily violent criminal enterprise with a history of conflict with law enforcement. In light of the large number of defendants, the allegations levelled against them, and the organization to which they belonged, the District Court clearly had discretion to implement the security measures that it did.
 
 
 85
 Security measures similar to those employed during this trial have frequently been approved by this and other courts. The Supreme Court has approved the presence of armed, uniformed guards inside a courtroom. Holbrook, 475 U.S. at 570-71, 106 S.Ct. at 1346-47. In this case, the courtroom security personnel were unarmed and not conspicuously in uniform. We have approved the use of metal detectors outside a courtroom. Hellum, 28 F.3d at 907-08; United States v. Carter, 815 F.2d 1230, 1231 (8th Cir.1987). We upheld the sequestration of a jury in United States v. Lee, 886 F.2d 998, 1001 (8th Cir.1989), cert. denied, 493 U.S. 1032, 1033, 1034, 110 S.Ct. 748, 751, 754, 107 L.Ed.2d 765, 768, 770 and 495 U.S. 906, 110 S.Ct. 1926, 109 L.Ed.2d 290 (1990), and in United States v. Faul, 748 F.2d 1204, 1221 (8th Cir.1984), cert. denied, 472 U.S. 1027, 105 S.Ct. 3500, 3501, 87 L.Ed.2d 632 (1985). The Second Circuit approved "secure transportation for the jurors to and from court" as well as "substantial numbers of armed guards on the premises" in United States v. Maldonado-Rivera, 922 F.2d 934, 971 (2d Cir.1990), cert. denied, 501 U.S. 1211, 1233, 111 S.Ct. 2811, 2858, 115 L.Ed.2d 984, 1025, 1026 (1991), a case involving four defendants tried for conspiracy to commit an armed bank robbery. We note that the crimes with which the defendants in this case were charged were more numerous and violent than those charged in Maldonado-Rivera. Thus substantial precedent supports the District Court's decision to implement these security measures.
 
 
 86
 Finally, we note that the jury in this case demonstrated that the security measures did not undermine its ability to be impartial by acquitting two of the nine defendants and by carefully selecting which predicate acts it found to be proven in regard to each of the other seven. See Paccione, 949 F.2d at 1193 (finding that "the fact that the jury acquitted each of the defendants on several counts strongly indicates that [the use of an anonymous jury] did not induce any lack of objectivity.")
 
 
 87
 We conclude that the appellants have failed to meet their burden of affirmatively demonstrating that the security measures prejudiced the jury. We therefore hold that the District Court did not abuse its discretion by implementing the security measures used during the trial.
 
 D. Juror 66
 
 88
 On December 9, 1992, Juror 66 approached a courtroom security officer and asked to speak to the chief of security. When informed of this request, the District Court conferred with counsel and decided to question the juror about his concerns outside the presence of all except the attorneys and the defendants. The court consulted the attorneys regarding what questions should be asked. In response to the court's questions, the juror stated that he was concerned about the security of the jury because he had observed "members of the Moorish Science Temple parked about four blocks from where we are located." Tr. vol. 19 at 98. When asked how he had determined that the people in question were members of the Temple, the juror replied that "[t]hey were all wearing the fezzes."[11] Id. at 100. The court suggested that the people wearing fezzes might have been attending a Shriners convention that was then in town, and the juror agreed that this was a possibility. The juror repeatedly asserted that his observation would not affect his ability to be impartial. He also stated that he had not discussed his observation with any other juror and that no other juror had discussed the matter with him. Defendant Bennett's attorney moved to strike the juror for cause on account of bias. The court denied this motion, and Bennett now contends that in so doing the court erred.
 
 
 89
 "The decision of whether or not to remove a juror is normally vested in the wise discretion of the trial court." Edwards, 994 F.2d at 424 (quoting United States v. Key, 717 F.2d 1206, 1209 (8th Cir.1983)). "If the record shows a legitimate basis for [the district court's] decision, there is no abuse of that discretion." Key, 717 F.2d at 1209. In this case the record reveals a legitimate basis for the District Court's decision not to remove Juror 66. When questioned by the court, Juror 66 stated three times that his observation of the people wearing fezzes would have no impact on his ability to be impartial. He merely expressed his concern for the security of the jury in a manner evidencing no bias against the defendants. Cf. United States v. Harris, 908 F.2d 728, 734 (11th Cir.1990) (finding no abuse of discretion in the district court's decision not to remove a juror who remarked "do it to him good" as a government witness prepared to testify), cert. denied, 498 U.S. 1093, 111 S.Ct. 979, 112 L.Ed.2d 1063 and 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991). We conclude that the District Court did not abuse its discretion when it refused to remove Juror 66.
 
 
 90
 E. Remarks of the District Court Quoted in a Newspaper Article
 
 
 91
 At the close of the proceedings of March 15, 1993, the District Court gave the jury its customary admonition to pay no attention to media coverage of the case. The next morning a prominent St. Louis newspaper reported that "Judge George F. Gunn Jr. asked the news media not to publish Michael Lewis-Bey's photo, warning that his life is in jeopardy." Michael D. Sorkin, Temple Leader Called Drug Dealer, St. Louis Post-Dispatch, March 16, 1993, at 3A. That morning the court discussed the article with the defendants and the attorneys, outside of the presence of the jury. The court explained that it had told the media that Lewis could be in danger from other prisoners in the institution where he was under protective custody because prisoners in general tend to dislike witnesses for the government. The court further stated that it had not mentioned the defendants in this case.
 
 
 92
 When the jurors entered the courtroom later that morning, the District Court addressed them as a group and asked if any of them had "seen anything on television or in the newspapers about the testimony of Mr. Michael Lewis-Bey?" Tr. vol. 54 at 17. After none of the jurors responded in the affirmative, the court commended them for following the instructions to pay no attention to media coverage of the case. Later that day the court again addressed the jurors collectively and asked "[h]as anyone been talked to about either any newspaper article in the Post-Dispatch ... or any television report?" Id. at 145. Again no juror indicated that he had seen or heard about the article. Three jurors stated that people had talked to them about a sketch of the jury that was shown on television but that they had not discussed the merits of the case. The court then told all the jurors that if anyone attempted to talk to them about the case they should report that to the court. The trial then proceeded. Appellants Bennett and Hopkins contend that the District Court should have questioned each of the jurors individually regarding possible exposure to the article and that the court should have conducted a full hearing concerning its own possible bias or disqualified itself from the case.
 
 
 93
 We first address the appellants' contention that the court erred by not questioning each juror individually about possible exposure to the article. A district court has "broad discretion in determining the prejudicial effect on the jury of newspaper articles that are published during a criminal trial." United States v. Baker, 855 F.2d 1353, 1361 (8th Cir.1988), cert. denied, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989); see also Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959). This discretion extends to the manner in which the court goes about making that determination. Baker, 855 F.2d at 1361. "[I]f no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further." Margoles v. United States, 407 F.2d 727, 735 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969); see also United States v. Sanders, 962 F.2d 660, 671 (7th Cir.), cert. denied, 506 U.S. 892, ----, 113 S.Ct. 262, 284, 121 L.Ed.2d 192, 210 (1992); United States v. Concemi, 957 F.2d 942, 946 (1st Cir.1992); United States v. Jones, 542 F.2d 186, 194 (4th Cir.), cert. denied, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375, 376 (1976). While we have recommended an individualized inquiry, see United States v. Hood, 593 F.2d 293, 296 (8th Cir.1979), a collective inquiry is not a per se abuse of discretion. See Baker, 855 F.2d at 1361 (approving a collective inquiry and noting that "[t]he district court was in the best position to measure the prejudicial effect, if any, of the article on the jurors").
 
 
 94
 Having thoroughly reviewed the record, we conclude that the District Court did not abuse its broad discretion by questioning the jurors collectively about their possible exposure to this article. No evidence indicated that any of the jurors had seen the article in question. The court twice asked if any of them had observed any publicity about the trial, the first time referring to anything "in the newspapers about the testimony of Mr. Michael Lewis-Bey" and the second time to "any newspaper article in the Post-Dispatch." Tr. vol. 54 at 17, 145. None of the jurors responded affirmatively to either of these questions. Furthermore, the fact that three jurors frankly admitted that people had talked to them about a television newscast concerning the trial indicates that the jurors were not inhibited in their responses by being questioned collectively rather than individually. In these circumstances, the District Court's collective inquiry did not constitute an abuse of discretion.
 
 
 95
 The appellants also argue that Judge Gunn should have conducted a full hearing into his own possible bias or disqualified himself from the case. "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned ... [or] [w]here he has personal bias or prejudice concerning a party." 28 U.S.C. Sec. 455(a)-(b)(1) (1988). "We review rulings on motions to recuse for abuse of discretion. The test is one of objective reasonableness, that is, whether the judicial officer's impartiality might reasonably be questioned under the circumstances." Lunde v. Helms, 29 F.3d 367, 370 (8th Cir.1994) (internal citation omitted), cert. denied, --- U.S. ----, 115 S.Ct. 1111, 130 L.Ed.2d 1076 (1995). The Supreme Court recently explained that disqualification of a judge for bias is seldom appropriate unless the bias derives from an "extrajudicial source." Liteky v. United States, --- U.S. ----, ----, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994). The Court held that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id.
 
 
 96
 The District Court's impartiality could not reasonably be questioned in this case. The morning the article was published, the court explained its remarks to the defendants and the attorneys. This explanation revealed no bias against the defendants. Indeed, it showed good judgment. Michael Lewis and his family were in the witness protection program, and the publication of his photograph would have been directly contrary to the purposes of that program. In requesting the news media not to publish Michael Lewis's photo, the court gave a reason that did not implicate any of the defendants in this case. We conclude that the court did not display any antagonism toward the defendants, much less the "deep-seated and unequivocal antagonism that would render fair judgment impossible" that alone would justify disqualification for bias. Id. at 1158.
 
 F. Jurors' Notes
 
 97
 The District Court did not give the jurors in this case an immediate opportunity to view exhibits when they were admitted into evidence. Instead the court on specified days would have the exhibits set out on tables, and the jury was permitted to view the exhibits in silence and take notes. Because the court would not allow the jurors to take notes while witnesses were testifying, the jurors' notes were retained by the court. Noble Bennett and Raymond Amerson argue that the court's procedure constitutes reversible error.
 
 
 98
 The decision whether to permit jurors to take notes is within the sound discretion of the trial court. United States v. Bassler, 651 F.2d 600, 602 n. 3 (8th Cir.), cert. denied, 454 U.S. 944, 1151, 102 S.Ct. 485, 1018, 70 L.Ed.2d 254, 305 (1981). Note taking by jurors is not a favored procedure. As we have stated, trial courts are properly concerned that the juror with the most detailed notes, whether accurate or not, may dominate jury deliberations. Id. The length and complexity of this trial does not diminish that concern. Indeed, in a long and complex trial the juror with the better notes may more easily dominate deliberations.
 
 
 99
 The court was also well within its discretion to permit the jurors to take notes while viewing the exhibits but not during other parts of the trial. The First Circuit has approved a district court's decision to allow jurors to take notes only during opening statements, closing arguments, and the jury charge. United States v. Porter, 764 F.2d 1, 12 (1st Cir.1985). By restricting the jurors' note-taking activities to exhibit-viewing days, as the District Court did in the present case, the taking of notes did not distract jurors from live testimony or other evidence that was being offered in court. Neither Amerson's nor Bennett's arguments convince us that the court abused its discretion by permitting only limited note taking during the course of the trial.
 
 III.
 
 100
 The appellants argue that the District Court made a number of errors when admitting evidence. We will consider each argument in turn. As we stated above, we review the evidentiary rulings of a district court under the deferential abuse-of-discretion standard and "will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." Ballew, 40 F.3d at 941.
 
 A. Exhibits Introduced by the Government
 
 101
 The appellants argue that the District Court abused its discretion when it admitted documents and various scrapbooks seized pursuant to search warrants executed at the homes of JLO members or their relatives. The scrapbooks contain newspaper articles generally relating to the drug trade in St. Louis. The documents include two police reports outlining the investigation of the MSTA, a crime bulletin describing the activities of "extremely dangerous" members of the MSTA, several newspaper articles including one that states that the MSTA was "suspected of drug trafficking," and a complaint from a federal forfeiture action against Jerry Lewis. Other items include articles about Louis Farrakhan and Drug Enforcement Agency (DEA) reports regarding the debriefing of government witness George Noel. It is important to make the following point explicitly and unambiguously: these items, including the police and DEA reports, were found in the homes of the appellants or their relatives; the government was not attempting to introduce copies of reports taken out of law enforcement files.
 
 
 102
 The appellants argue that these exhibits constitute inadmissible hearsay. All of these items are out-of-court statements, but the government argues that they are not hearsay statements because the statements were not offered to prove the truth of the matters asserted in them. See Fed.R.Evid. 801(c). The District Court agreed, stating that the materials constituted evidence of the JLO's extensive intelligence-gathering operations. The government also argues that the exhibits tended to show an association between the defendants, which is an element of the RICO offenses charged in the Superseding Indictment. The District Court and the government are unquestionably correct. The testimony of the government witnesses laying the foundation for the exhibits makes it clear that they were offered not for the truth of the matters asserted but to show association and the JLO's intelligence-gathering activities. While inadmissible to prove the assertions made in the articles and documents, these exhibits were not hearsay for the purposes for which they were offered. Moreover, the District Court instructed the jury that evidence of "previously committed acts similar to those charged in this case" could not be used to prove that the defendants committed such acts in this case. Instruction 72. During deliberations, in response to a question from the jury about the newspaper articles, the court stated that the articles could be used as evidence only "for the purposes allowed by the instructions of the Court." Tr. vol. 94 at 51. These limiting instructions helped to confine the jury's use of the evidence seized from the homes of JLO members and their relatives to the purposes for which that evidence was offered.
 
 
 103
 Gerald Hopkins, in his pro se supplemental brief, competently argues that many of the exhibits relating to him should have been excluded because they tend to reveal his criminal record. He is most specifically concerned with the police reports that include booking photographs or "mug shots." Evidence of prior crimes is inadmissible, according to Hopkins, under Federal Rule of Evidence 404(b). Rule 404(b), however, only excludes such evidence when it is offered "to prove the character of a person in order to show action in conformity therewith." As discussed above, the evidence was offered to prove the association of the defendants and their intelligence-gathering activities. This evidence is thus not inadmissible evidence of prior crimes under Rule 404(b) for the same reason that it is not hearsay under Rule 801(c).
 
 
 104
 Bennett and Darden correctly point out that relevant, admissible evidence may still be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Bennett specifically argues that the Supreme Court has held that police reports should not be shown to the jury because of the unduly prejudicial nature of such reports, though none of the decisions he cites supports that proposition. The starting point for a court attempting to balance probative value against unfair prejudice under Rule 403 is the probative value of the challenged evidence. The more probative a piece of evidence is, the more difficult it will be for a defendant to show that such probativity is substantially outweighed by unfair prejudice. The exhibits offered by the government were highly probative of the association between the defendants and of their thirst for information regarding the drug trade, specifically the activities of competitors and law enforcement agencies. The fact that the JLO had access to and collected police and DEA reports on their activities, for instance, is strong evidence of their high level of organization and their preoccupation with organizational security. The appellants, unfortunately, do not adequately explain why these exhibits were unfairly prejudicial. Darden, for example, says only that the "prejudice to defendants ... is obvious." Darden's Brief at 66. We agree, but it is not clear how the exhibits were unfairly prejudicial. Therefore we cannot say that the District Court abused its discretion when it admitted these highly probative exhibits.
 
 
 105
 Carla Seals specifically appeals the admission of a single photograph, Government's Exhibit 371, which was seized from her residence by law enforcement officers and shows a large amount of money spread out on a bed. She claims that it was not relevant, see Fed.R.Evid. 401, or that any probative value is substantially outweighed by unfair prejudice, see Fed.R.Evid. 403. To the contrary, we agree with the government that the photograph tends to prove that Seals or an associate of hers had access to large amounts of cash, a proposition vigorously disputed by the appellants at trial because it would tend to show that they were involved in illegal activity as they did not have any legal sources of large income. The photograph is therefore relevant. It is also prejudicial. Like most evidence introduced by the government in a criminal trial, it tends to prove the defendants' involvement in criminal activities. Nonetheless we do not understand, nor has Seals explained, how it could be unfairly prejudicial. The District Court thus did not abuse its discretion by admitting the photograph.
 
 B. Evidence of Twelve Unindicted Murders
 
 106
 Government witness Ronnie Thomas agreed to testify pursuant to a plea agreement that he entered with the government. In accordance with that agreement, Thomas pled guilty to several crimes, including counts I, IX, and X of the initial indictment in this case, and agreed to testify truthfully against his co-conspirators. The federal and state governments agreed to recommend that Thomas receive a total sentence of life in prison for the crimes to which he pled guilty, and they agreed not to prosecute Thomas for other past crimes, including murder, for which he otherwise might have been sentenced to death in Missouri state court. In the opening minutes of Thomas's testimony, the government questioned him about his plea agreement. The government then proceeded to ask Thomas about various crimes that he had committed, including some for which he would not be prosecuted in accordance with the agreement. In the course of his testimony, Thomas described his involvement in ten murders with which neither he nor any of the defendants were charged in the indictment. During cross examination, Thomas described two additional unindicted murders. Thomas testified that some of the defendants, most notably Jerry Lewis, were involved in several of these murders. Appellant Darden contends that the District Court erred in admitting Thomas's testimony concerning these and other unindicted crimes.
 
 
 107
 Federal Rule of Evidence 404(b) provides in part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." A district court has broad discretion in determining whether to admit evidence under this rule. United States v. Haynes, 881 F.2d 586, 590 (8th Cir.1989). Indeed, "the decision to admit such evidence will only be reversed when it is clear that the questioned evidence has no bearing upon any of the issues involved at trial." Id. (quoting United States v. Gustafson, 728 F.2d 1078, 1083 (8th Cir.), cert. denied, 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984)). Furthermore, a district court's discretion in determining the admissibility of evidence is "particularly broad in a conspiracy trial." United States v. Willis, 997 F.2d 407, 414 (8th Cir.1993) (citation to quoted case omitted), cert. denied, --- U.S. ----, 114 S.Ct. 704, 126 L.Ed.2d 670 (1994).
 
 
 108
 Having reviewed the record, we conclude that the District Court did not abuse its discretion in this case. The government elicited Thomas's testimony concerning these unindicted crimes partly in order adequately to explain the benefits that he received under his plea agreement (namely, that he would not be prosecuted for these crimes). The government made clear during its questioning that Thomas knew that he would not be prosecuted for the crimes. "In this circuit, the rule is well-established that a confederate's guilty plea is admissible, even on the Government's direct examination of the witness, as evidence of the witness' ... credibility, or of his acknowledgement of participation in the offense." Willis, 997 F.2d at 414 (emphasis in original) (citations to quoted cases omitted). The government also elicited Thomas's testimony in anticipation of attacks on his credibility that would come during cross examination. This Court has held that disclosure of a guilty plea in order to blunt attacks on a witness's credibility during cross examination is permissible and serves a legitimate purpose. See United States v. Roth, 736 F.2d 1222, 1227 (8th Cir.), cert. denied, 469 U.S. 1058, 105 S.Ct. 541, 83 L.Ed.2d 429, 433 (1984); United States v. Carr, 647 F.2d 867, 869 (8th Cir.), cert. denied, 454 U.S. 855, 102 S.Ct. 303, 70 L.Ed.2d 149 (1981). Indeed, in this case the defense did attempt to impugn Thomas's credibility during cross examination by honing in on his testimony concerning the unindicted crimes, frequently focusing more attention on them than had the government, and eliciting testimony concerning two unindicted murders that Thomas never even mentioned during direct examination. This conduct undermines their contention on appeal that the evidence never should have been admitted.
 
 
 109
 Moreover, the District Court instructed the jury that "[y]ou have heard evidence that the defendants previously committed acts similar to those charged in this case. You may not use this evidence to decide whether the defendant [sic] carried out the acts involved in the crime [sic] charged here." Jury instruction 72. "Where evidence concerning confederates' guilty pleas was not used as substantive evidence of the defendant's guilt and was followed by a limiting instruction, we have given broad discretion to the court in ruling on the admission of such evidence." Willis, 997 F.2d at 414. We conclude that the District Court did not abuse its broad discretion by admitting Ronnie Thomas's testimony concerning unindicted crimes.
 
 
 110
 C. Use of Government-Prepared Notes by Witness Earl Parnell
 
 
 111
 Government witness Earl Parnell was a participant in the criminal activities of Noble Bennett's organization and the JLO. In 1988 he became an informant for the government. As an informant, Parnell took part in many meetings with members of the enterprise during which the criminal activities of the enterprise were discussed. After those meetings, Parnell would meet with government agents to discuss what he had heard. Following each of these debriefing sessions, a DEA report would be prepared detailing Parnell's account of his conversations. Parnell reviewed these DEA reports in preparation for his testimony. While testifying Parnell would, at the government's request, identify the reports relevant to his testimony, and he sometimes referred to the reports in order to refresh his memory. The reports were neither admitted into evidence nor made available to the jury to read. Appellant Bennett contends that the District Court erred in allowing Parnell to refer to these reports.
 
 
 112
 "The propriety of permitting a witness to refresh his memory from a writing prepared by another largely lies within the sound discretion of the trial court." United States v. Boyd, 606 F.2d 792, 794 (8th Cir.1979) (quoting United States v. Conley, 503 F.2d 520, 522 (8th Cir.1974)). In Boyd, this Court approved the district court's decision to permit a witness to testify while referring to a report summarizing his previous statements to the FBI. Id.; see also United States v. Church, 970 F.2d 401, 409 (7th Cir.1992) (approving district court's decision to permit a government informant to testify while referring to notes prepared by government agent who interviewed him after his undercover drug buys), cert. denied, --- U.S. ----, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993). The DEA reports in this case were based on Parnell's own accounts of conversations in which he took part. The District Court properly permitted him to refer to them in order to refresh his recollection of those conversations. See Fed.R.Evid. 612; United States v. Shyres, 898 F.2d 647, 657 (8th Cir.), cert. denied, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990); Boyd, 606 F.2d at 794. Moreover, we note that often when Parnell mentioned the reports, he was simply identifying them for the record. Having reviewed the record, we find no abuse of discretion by the District Court.
 
 
 113
 Bennett also contends that the District Court erred in limiting the defendants' cross-examination of Parnell concerning the DEA reports. The court stated that
 
 
 114
 [w]hat I'll let the parties do on the cross-examination is ask the witness whether he knows certain information is in there. If he does, he can say what it is. If he says he doesn't know, I'm not going to have him go through each one of those pages of the DEA-6 [the reports] to find it. What any of the defendants can do, if they choose to do so, is have a witness of their own go through the DEA-6s and they can ask whether that witness has noted what they seek to bring out.
 
 
 115
 Tr. vol. 31 at 3. The court was more than sufficiently generous to the defendants. The applicable rule provides in part that
 
 
 116
 if a witness uses a writing to refresh memory for the purpose of testifying ... an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.
 
 
 117
 Fed.R.Evid. 612. Rule 612 requires only "disclosure of the passage actually used by the witness, and other portions relating to the same subject matter." United States v. Larranaga, 787 F.2d 489, 501 (10th Cir.1986); see also United States v. Costner, 684 F.2d 370, 373 (6th Cir.1982). Access is limited to those writings that arguably have an impact upon the testimony of the witness. In this case the court permitted the defendants to access the entirety of the DEA reports through a witness of their own; the court simply limited cross examination to those portions of the reports that the witness was able to recall. The court sought to prevent the defense attorneys from forcing the witness "to search through all those 5 or 600 pages each time a question is asked," Tr. vol. 31 at 3, in order to avoid "a terrible delay in the trial." Id. We conclude that this was not an abuse of discretion.
 
 
 118
 D. Testimony of Alleged Jail-House Informant George Noel
 
 
 119
 Bennett argues that the District Court should have excluded the testimony of co-conspirator and government witness George Noel relating to Bennett's plans to intimidate government witnesses by murdering their relatives. Bennett argues that the testimony should have been excluded because his statements were obtained in violation of his Sixth Amendment right to counsel. In Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court held that a defendant's Sixth Amendment right to counsel is infringed if the government places an informant in the defendant's cell deliberately to elicit incriminating statements. Id. at 206, 84 S.Ct. at 1203. In this case, however, there is no evidence that Noel agreed to cooperate with the government until after Bennett made his incriminating statements to Noel in their shared holding cell. Noel was therefore a private citizen, not a state actor, when Bennett's statements were made, and Bennett's constitutional rights are thus not implicated by the government's subsequent use of Noel's testimony regarding those statements.
 
 IV.
 
 120
 Darden, Hopkins, Lewis, and Seals challenge a number of the District Court's instructions to the jury. A district court has "wide discretion" to formulate jury instructions. United States v. Logan, 49 F.3d 352, 359 (8th Cir.1995). This Court will affirm a district court's choice of jury instructions if the charge to the jury fairly and adequately contains the law applicable to the case. Id. Moreover, "[i]n determining the effect of [an] instruction on the validity of [a] conviction, ... a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." United States v. West, 28 F.3d 748, 750 (8th Cir.1994) (quoting Boyde v. California, 494 U.S. 370, 378, 110 S.Ct. 1190, 1196-97, 108 L.Ed.2d 316 (1990) (citation to quoted case omitted)).
 
 
 121
 Appellants' most significant allegations of instructional error center on the elements of the RICO offenses charged in Counts I and II of the Superseding Indictment. The instructions implicated are Instructions 11, 12, 15, 16, 32, and 33. Instruction 11 sets out, in a general fashion, what the government was required to prove to meet its burden on Count I, the substantive RICO offense. See supra pp. 1517-18. Instructions 12 through 16 elaborate on each of the elements of the offense. Appellants claim that Instruction 11 is defective in the same way that Instructions 12, 15, and 16 are defective. Our analysis of Instructions 12, 15, and 16 therefore applies with equal force to Instruction 11.
 
 
 122
 Instruction 12 instructs the jury on the requirement that the government prove the existence of an "enterprise." Jerry Lewis and Gerald Hopkins argue that the instruction impermissibly varies from the charges in the Superseding Indictment. An instruction that broadens the possible bases for conviction infringes a defendant's Fifth Amendment right to a grand jury indictment. See Stirone v. United States, 361 U.S. 212, 217-18, 80 S.Ct. 270, 273-74, 4 L.Ed.2d 252 (1960). Instruction 12 describes an enterprise as "any individual, partnership, corporation, association, or other legal entity" or "any union or group of individuals associated in fact although not a legal entity." Appellants argue that the indictment charged only a "group of individuals associated in fact although not a legal entity," Instruction 12. See, e.g., Lewis's Brief at 112-13. They are, however, patently wrong about that. The indictment charged that the enterprise in this case consisted of the appellants and others "associated in fact" but did not specify whether they constituted a "legal entity." Superseding Indictment at 2. Thus no variance exists between the Superseding Indictment and Instruction 12 because the instruction merely describes both legal and non-legal associations in fact. The District Court did not abuse its discretion when it gave Instruction 12 to the jury.
 
 
 123
 Lewis, Darden, Seals, and Hopkins argue that the District Court abused its discretion by charging the jury with Instruction 15.[12] The instruction charged the jury on one of the elements of a RICO offense as follows:
 
 
 124
 d. The Fourth Element--Participation in Conduct of the Enterprise
 
 
 125
 The fourth element which the government must prove beyond a reasonable doubt is that the defendant conducted or participated, directly or indirectly, in the affairs of the enterprise. The terms "conduct" and "participate in the affairs" of an enterprise means [sic] the performance of acts, functions, or duties that are necessary or helpful to the operation of the enterprise. To "conduct or participate, directly or indirectly in the conduct of the enterprises affairs," one must participate in the operation or management of the enterprise itself. An enterprise is operated not just by upper management. An enterprise is also operated by lower-rung participants who are under the direction of upper management. The terms "conduct" and "participate in the affairs" of an enterprise include the performance of acts, discharge of duties that are necessary or helpful to its operation. A person may participate in the conduct of an enterprise even though he had no part in the control of the enterprise, and even though he had no share in any of its profits. But the participation must be knowing as defined in these instructions.
 
 
 126
 Instruction 15. This instruction is defective, according to the appellants, for two reasons. First, the District Court omitted the words "in the conduct of" on three occasions when it referred simply to "participation in the affairs" rather than "participation in the conduct of the affairs" of an enterprise. Second, the court stated that a "person may participate in the conduct of an enterprise even though he had no part in the control of the enterprise" in what appellants characterize as a direct contradiction of the Supreme Court's opinion in Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993).
 
 
 127
 Appellants are correct when they argue that the statutory language makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. Sec. 1962(c) (1988) (emphasis added), and that this language requires "some participation in the operation or management of the enterprise itself," Bennett v. Berg, 710 F.2d 1361, 1364 (8th Cir.) (en banc), cert. denied, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). They are incorrect, however, when they argue that the instruction "omits the element of direction." See, e.g., Lewis's Brief at 120. First, the court used the phrase "participate in the conduct of" the enterprise or its affairs on three separate occasions, including the title of the instruction. Second, in Reves v. Ernst & Young, the Supreme Court specifically approved this Court's operation-and-management test as an easy-to-apply formulation of the requirement that the government prove a defendant had "some part in directing the enterprise's affairs." 507 U.S. at 179, 113 S.Ct. at 1170 (emphasis in original). The District Court included a proper statement of that test in Instruction 15 when it used the following language:
 
 
 128
 To "conduct or participate, directly or indirectly in the conduct of the enterprise's affairs," one must participate in the operation or management of the enterprise itself. An enterprise is operated not just by upper management. An enterprise is also operated by lower-rung participants who are under the direction of upper management.
 
 
 129
 Instruction 15. This language is almost a verbatim quote from the Supreme Court's opinion in Reves, 507 U.S. at 184-86, 113 S.Ct. at 1173. Thus despite the fact that the District Court omitted the phrase "in the conduct of" as many times as it included it, the instruction fairly and adequately contains the law applicable to the case. The instruction clearly informs the jury that some participation in the operation and management of the enterprise is required, but it also makes it clear that this requirement does not limit criminal liability to an enterprise's top managers or policy makers. That distinction is the crux of the appellants' second argument concerning Instruction 15.
 
 
 130
 When the District Court stated that a "person may participate in the conduct of an enterprise even though he had no part in the control of the enterprise," the court did not err. Jerry Lewis argues that the Supreme Court "in Reves held that a defendant must 'control' the enterprise, that is, that a defendant must have some part in the control of the enterprise [sic] affairs." Lewis's Brief at 121. Lewis is wrong. His citation of authority is to Justice Souter's dissent in Reves, where Justice Souter remarked (with obvious irony) that if the word "conduct" is limited to its role as a verb, a decision of the Court with which he disagreed, it is "plausible to find in it a suggestion of control." Reves, 507 U.S. at 187, 113 S.Ct. at 1174 (Souter, J., dissenting). Contrary to Lewis's assertion, the Supreme Court has never said that "the word 'conduct' when used as a verb suggests 'control.' "[13] Lewis's Brief at 125. As explained above, the Court in Reves held that the government must prove some part in the direction, not control, of the enterprise's affairs, and then went on to state that this Court's operation-and-management test is a proper formulation of that requirement. Reves, 507 U.S. at 178-80, 113 S.Ct. at 1170. The District Court's instruction was a proper application of our operation-and-management test, especially in light of the evidence presented at trial. Based on that evidence, it is clear that Jerry Lewis, and Lewis alone, was in control of the activities of the JLO as the word "control" is commonly used. As the Court in Reves noted, however, liability under the RICO statute is not limited to the kingpin; an enterprise is also operated "by lower-rung participants in the enterprise who are under the direction of upper management." Reves, 507 U.S. at 184, 113 S.Ct. at 1173. Thus the District Court properly stated that a "person may participate in the conduct of an enterprise even though he had no part in the control of the enterprise" because operators are liable under Sec. 1962(c). The court's instruction properly distinguishes between the nonliability of mere participants in the enterprise and the liability of operators and managers, a distinction that was critical in this case because the evidence permitted the jury to find that all of the defendants, except for Lewis, were operators or managers acting under Lewis's control. While they may well have exercised some control over the affairs of the enterprise in their various capacities, the government was only required to show their participation in the operation and management of the affairs of the enterprise. Instruction 15 fairly and adequately states the government's burden in this case, and thus the District Court did not abuse its discretion by charging the jury with Instruction 15.
 
 
 131
 A number of appellants challenge Instructions 32 and 33 on similar grounds. These instructions charge the jury on the essential elements of the charges in Count II of the Superseding Indictment, the RICO conspiracy. To the extent that these arguments relate to the District Court's omission of the verb "conduct" and the use of the operation-and-management test, we reject them for the same reasons we reject those arguments with respect to Instructions 15 and 16. Appellants also argue that Instructions 32 and 33 misstate the elements of a RICO conspiracy offense. They argue that the instructions allowed the jury to return a guilty verdict if the government proved the narcotics conspiracy charged in Count I as a predicate act of the substantive RICO offense. The relevant part of Instruction 33, which is the more problematic of the two instructions, reads as follows:... the government must prove ... One: A conspiracy or agreement, as detailed in Count I [sic] of the indictment, existed between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity.
 
 
 132
 Instruction 33. Admittedly, this instruction is not a model of clarity. Count I relates solely to the substantive violation of the RICO statute, which includes a narcotics conspiracy as one of the predicate acts, and Count II realleges everything in Count I and also alleges a conspiracy to violate the RICO statute. The phrase "as detailed in Count I of the indictment" therefore should either be placed after the word "enterprise" or should read "Count II." It is clear to anyone reading the entire instruction, however, that the government's burden was to prove an agreement or conspiracy to violate the RICO statute through the enterprise charged in Count I in the manner described in Count II. Thus the court's instruction, while flawed, does not warrant reversal.
 
 
 133
 Darden makes a more focused attack on Instruction 33, arguing that it should have stated that "[i]n determining whether the defendant became a member of the conspiracy [the jury] may consider only the acts and statements of that particular defendant." 8th Cir.Model Crim.Jury Instr. 5.06B (1994). Reading the instruction in its entirety, we believe that this concept was adequately and appropriately conveyed to the jury by Instruction 33. Moreover, this exact language was included in Instruction 58. Darden's contention is thus without merit.
 
 
 134
 We have also considered appellants' challenges to Instructions 6, 14, 25, 45, 46, 47, 66, and 67 and find them to be without merit. The District Court did not abuse its discretion by giving these instructions to the jury.
 
 
 135
 In sum, we conclude that the jury instructions challenged by the appellants in this case, viewed in the context of the overall charge, fairly and adequately contain the law applicable to the case. The District Court thus did not abuse its discretion by giving these instructions.
 
 
 136
 Several appellants also contend that the District Court abused its discretion when it refused to give a number of their proposed jury instructions. A defendant is entitled to a jury instruction if the instruction is (1) requested in a timely manner, (2) supported by the evidence, and (3) a correct statement of the law. United States v. Casas, 999 F.2d 1225, 1230 (8th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 894, 127 L.Ed.2d 86 (1994). We have reviewed the proposed instructions cited in the appellants' briefs that were not given to the jury. In most of the instances cited by appellants, the subject matter of the instruction was incorporated in instructions given by the District Court, although not in the form requested. This is simply not an abuse of the court's broad discretion to formulate jury instructions. In other instances the instruction is either unsupported by the evidence or an incorrect statement of the law. The court did not abuse its discretion by refusing to give these instructions.
 
 V.
 
 137
 Several appellants contend that the District Court committed various errors in the course of sentencing them pursuant to the sentencing guidelines. We review the factual findings a district court makes in sentencing for clear error, and the application of the guidelines to the facts de novo. United States v. Johnson, 43 F.3d 1211, 1213 (8th Cir.1995). "In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. Sec. 6A1.3, policy statement (1992).
 
 
 138
 A. Accountability of Seals for the Murder of Ronald Anderson
 
 
 139
 In the course of sentencing Carla Seals, the District Court found that she was accountable for the murder of Ronald Anderson. Seals was not charged with this murder in the indictment, but the court considered her involvement in the murder to be relevant to her RICO convictions. Pursuant to Sec. 2A1.1 of the guidelines, the finding that Seals was accountable for murder resulted in a base offense level of forty-three. Forty-three is the maximum offense level under the guidelines and carries a mandatory life sentence, which the court imposed on Seals. Seals contends that the evidence is insufficient to support the court's finding that she was accountable for this murder.
 
 
 140
 The guidelines provide that a defendant is accountable for "relevant conduct" including "all acts and omissions committed, aided, abetted, counseled, ... or willfully caused by the defendant ... that occurred during the commission of the offense of conviction." U.S.S.G. Sec. 1B1.3(a)(1)(A). "When sentencing a defendant, a district court may consider uncharged, relevant conduct that has been established by a preponderance of the evidence." Ballew, 40 F.3d at 943. Seals does not challenge the District Court's finding that this murder was relevant conduct. She argues that the evidence was insufficient to prove her involvement in the crime because the evidence relied upon by the District Court was not credible.
 
 
 141
 Seals concedes that some evidence implicates her in the murder of Ronald Anderson.[14] Ronnie Thomas testified that on December 12, 1988, Seals was present at a JLO meeting in her house at which the semiautomatic weapon used to murder Anderson was loaded, and that she then delivered it to another residence so that Thomas could pick it up to use in the murder. Later that night Thomas murdered Anderson with the weapon in retaliation for Anderson's supposed participation in a plot to kill Jerry Lewis. Seals contends that this testimony is insufficient to support the finding that she was accountable for the murder because (1) it is arguably contradicted by other evidence, and (2) Ronnie Thomas is a serial killer and admitted perjurer who cannot be believed. "Where there are two permissible views of the evidence," however, "the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Moreover, a district court's findings based on credibility "can virtually never be clear error." United States v. Cabbell, 35 F.3d 1255, 1260 (8th Cir.1994) (quoting United States v. Coppock, 919 F.2d 77, 79 (8th Cir.1990)).
 
 
 142
 Seals's argument on this issue boils down to an attack on the credibility of a government witness and on the court's choice between two permissible views of the evidence. The District Court chose to credit the testimony of Ronnie Thomas rather than the allegedly contradictory evidence noted by Seals. The question of which of two contradictory stories to believe is largely a question of credibility, and, as noted above, findings based on credibility virtually never constitute clear error. The District Court was in the best position to evaluate the testimony of various witnesses, and the record supports its finding that Seals was accountable for the murder of Ronald Anderson. The court's finding was thus a "permissible view of the evidence" that cannot be clearly erroneous. A preponderance of the evidence establishes that Seals aided and abetted the individuals who actually killed Anderson, and the court properly held her accountable for the murder.
 
 
 143
 Because Seals was properly held accountable for Anderson's murder, we need not address her arguments concerning her drug offenses or the attempted murder of Lorenzo Petty. Even if these arguments were successful, Seals's offense level would remain at 43 because of her accountability for Anderson's murder. This offense level results in a mandatory sentence of life in prison. We therefore affirm Seals's life sentence.
 
 B. Darden's Sentencing Arguments
 
 144
 1. Accountability for 213 Kilograms of Cocaine
 
 
 145
 Carlton Darden[15] contends that the District Court erred by finding that he was accountable for at least 213 kilograms of cocaine.[16] The particular 213 kilograms of cocaine for which Darden was held accountable were supplied to the JLO by Juan Alfaro Gonzales from 1987 to 1991. Darden contends that the evidence does not support a finding that he directly participated in the distribution of the total amount. We conclude that the evidence supports the District Court's finding that the distribution of at least 213 kilograms of cocaine was the reasonably foreseeable act of Darden's co-conspirators in furtherance of a jointly undertaken criminal activity, for which he is accountable under U.S.S.G. Sec. 1B1.3(a)(1)(B).
 
 
 146
 The Sentencing Guidelines provide that "in the case of a jointly undertaken criminal activity," a defendant may be sentenced for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction." U.S.S.G. Sec. 1B1.3(a)(1)(B). "Section 1B1.3 applies to a ... participant who understands the full extent of the conspiracy." Ramey v. United States, 8 F.3d 1313, 1315 (8th Cir.1993). This Court has held that a defendant need not participate directly in the distribution of all the drugs for which he is held accountable; what is required is that the total amount be reasonably foreseeable to him. See United States v. Olderbak, 961 F.2d 756, 763-64 (8th Cir.), cert. denied, 506 U.S. 959, 113 S.Ct. 422, 121 L.Ed.2d 344 (1992); United States v. Rice, 49 F.3d 378, 382-83 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 2630, 132 L.Ed.2d 870 (1995). Actual knowledge of the total drug amount is not required. United States v. Adipietro, 983 F.2d 1468, 1476 (8th Cir.1993); Rice, 49 F.3d at 383. A relevant factor in determining whether the total drug amount was reasonably foreseeable to a defendant is "whether the defendant demonstrated a substantial level of commitment to the conspiracy." Rice, 49 F.3d at 383.
 
 
 147
 The evidence supports the District Court's finding that the distribution of at least 213 kilograms of cocaine was the reasonably foreseeable act of Darden's co-conspirators in furtherance of their jointly undertaken criminal activity. Michael Lewis, Rudy Weaver, and Ronnie Thomas all testified that Darden played a leading role in the JLO's drug trafficking operation in the late 1970s and early 1980s. Lewis stated that "Carlton Darden-Bey and Raymond Amerson-Bey distributed the majority of T's and blues for my brother Jerry." March 15, 1993 Tr. vol. at 61-62. Darden's role diminished over time, but no evidence indicates that he ever withdrew from the conspiracy. Indeed, Earl Parnell testified that in 1985 or 1986 Darden participated in a meeting to discuss the JLO's cocaine trade. Michael Lewis testified that Darden sold the JLO's cocaine from 1987 to 1989, years during which the trafficking of Gonzales's 213 kilograms occurred. Weaver, who was directly involved in the distribution of the 213 kilograms in question, testified that he sold Darden some of that cocaine several times during 1987 and 1988, and that Darden told him that he planned to resell it for a profit.
 
 
 148
 The evidence also establishes that Darden demonstrated his substantial commitment to this drug conspiracy by twice committing attempted murder on its behalf. Earl Parnell, George Noel, and Rochelle Bartlett testified that on April 16, 1980, Darden shot Bartlett at Jerry Lewis's behest because Bartlett had expressed suspicion that Lewis was informing on the drug trafficking business. Ronnie Thomas testified that on June 5, 1981, Darden helped hunt down rival drug dealer Lidell "Bud" Green, who Amerson subsequently attempted to kill. Michael Lewis testified that Darden knew of his co-conspirators' use of violence to further the interests of the JLO. In sum, considerable evidence establishes Darden's active participation in and understanding of the scope of this conspiracy.
 
 
 149
 The jury found beyond a reasonable doubt that Darden was part of the drug and murder enterprise and the narcotics conspiracy, and that he committed the two attempted murders as well as two separate drug offenses, including possession of cocaine with intent to distribute in 1987 and 1989. In light of the substantial evidence supporting these findings, we conclude that the District Court did not clearly err in finding by a preponderance of the evidence that the distribution of at least 213 kilograms of cocaine was foreseeable to Darden. Even if Darden did not directly engage in the distribution of the total amount, it was the reasonably foreseeable act of others in furtherance of a jointly undertaken criminal activity, for which he is accountable under U.S.S.G. Sec. 1B1.3(a)(1)(B).
 
 2. Enhancement for Possession of a Weapon
 
 150
 The District Court applied a two level enhancement to Darden's aggregated drug offenses for the possession of a weapon. Darden contends that the enhancement was improper because he was not present at the drug trafficking for which he was held accountable and thus his weapons could not have been present either.
 
 
 151
 Under U.S.S.G. Sec. 2D1.1(b)(1), a drug offense is enhanced two levels "[i]f a dangerous weapon (including a firearm) was possessed." An application note to this section states that "the adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. Sec. 2D1.1(b)(1), comment. (n. 3). We have repeatedly held that this language establishes the basic standard for determining whether the enhancement should be applied. United States v. McMurray, 34 F.3d 1405, 1416 (8th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995); United States v. Maxwell, 25 F.3d 1389, 1399 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 610, 130 L.Ed.2d 519 (1994). Thus a district court must find "by a preponderance of the evidence that it is not clearly improbable that the weapon had a nexus with the criminal activity." United States v. Richmond, 37 F.3d 418, 419 (8th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1163, 130 L.Ed.2d 1119 (1995).
 
 
 152
 As discussed supra pp. 1545-46, Darden is accountable for at least 213 kilograms of cocaine because he participated in the drug-related activities of the JLO in a variety of ways such that the total amount was foreseeable to him. The enhancement for possession of a weapon is proper because the evidence supports the District Court's finding that he participated in those activities while possessing guns. Michael Lewis testified that Darden regularly carried a pistol while selling drugs for the enterprise. Officer Saitz testified that on January 31, 1981, he found a loaded gun and numerous drugs underneath the seat of the car that Darden was driving. Officer Clifton testified that a loaded revolver was found in the car Darden was driving on December 8, 1982; a search revealed that Darden was carrying $893 in cash at that time. Earl Parnell, George Noel and Rochelle Bartlett testified that on April 16, 1980, Darden shot Bartlett at Jerry Lewis's behest because Bartlett had expressed suspicion that Lewis was informing on the drug trafficking business. The evidence thus establishes that Darden regularly possessed and used weapons in connection with his drug offenses.
 
 
 153
 "[T]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. Sec. 2D1.1, comment. (n. 3). The attempted murder that Darden committed in furtherance of the JLO's drug trafficking activities is thus precisely the kind of act that this provision was designed to deter. We conclude that the District Court did not clearly err by finding that it is not clearly improbable that Darden's possession of weapons had a connection to his drug offenses.
 
 3. Enhancements for Obstruction of Justice
 
 154
 Pursuant to U.S.S.G. Sec. 3C1.1, the District Court applied a two-level enhancement for obstruction of justice to Darden's base offense level for both his aggregated drug offenses and his attempted murders. Darden contends that the evidence is insufficient to support the enhancements. We disagree.
 
 
 155
 Section 3C1.1 provides that "if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, [the court should] increase the offense by 2 levels." Application note 3(b) to this section states that "committing, suborning, or attempting to suborn perjury," is conduct to which the enhancement applies. "This provision is not intended to punish a defendant for the exercise of a constitutional right," U.S.S.G. Sec. 3C1.1, comment. (n. 1), and the enhancement should not be applied simply because the jury disbelieved the defendant's testimony. United States v. Patel, 32 F.3d 340, 345 (8th Cir.1994). Nevertheless, "[a] defendant is subject to an obstruction enhancement under U.S.S.G. Sec. 3C1.1 if he testifies falsely under oath in regard to a material matter and does so willfully rather than out of confusion or mistake." United States v. Chadwick, 44 F.3d 713, 715 (8th Cir.1995) (per curiam); see also United States v. Dunnigan, 507 U.S. 87, 93-94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). "We give due regard to the district court's observations and express finding that a defendant lied to the jury." United States v. McCormick, 29 F.3d 352, 357 (8th Cir.1994).
 
 
 156
 The District Court found that Darden committed perjury at the trial when he denied any involvement in the attempted murder of Rochelle Bartlett. Darden argues that because other evidence arguably corroborates his testimony, the evidence does not support this finding. We disagree. Earl Parnell, George Noel and Rochelle Bartlett all testified that Darden shot Bartlett on April 16, 1980. Both Bartlett and Noel were eyewitnesses to the shooting, and Parnell testified that Darden himself described his role in the crime to Parnell. The jury found that the government had proven Darden's attempt to murder Bartlett beyond a reasonable doubt. After hearing all the evidence, the court also chose to credit the testimony of these three witnesses rather than Darden's. The court explicitly stated that "I'm not penalizing him for asserting his right to testify," but found that "in this instance there is a preponderance of the evidence to show that Mr. Darden-Bey did not tell the truth as he testified, based on evidence, specific testimony of Shelly Bartlett Troupe and of George Noel." Sent.Tr. at 146, 145. In determining that Darden falsely asserted his innocence of this crime, the court found by a preponderance of the evidence exactly what the jury found beyond a reasonable doubt. We cannot say that this finding is clearly erroneous.
 
 
 157
 In United States v. Briggs, 969 F.2d 689 (8th Cir.1992), which also involved a conflict between the defendant's testimony and that of another witness, this Court stated that "Briggs' testimony that he never sold heroin to Berg directly contradicts Berg's, and is inconsistent with the jury verdict. This testimony alone provides the basis for the court's upward adjustment." Id. at 691-92. Because the evidence establishes that Darden committed this attempted murder on behalf of the drug conspiracy, see supra p. 1546, his perjury justifies the enhancements applied to both Bartlett's attempted murder and the aggregated drug offenses.[17]
 
 4. Downward Departure
 
 158
 Finally, Darden contends that the District Court should have granted him a downward departure from the applicable sentencing range under the guidelines because of his allegedly minor role in the enterprise. A district court's failure to grant a defendant a downward departure is not reviewable on appeal if the court was aware of its authority to grant a departure. United States v. Evidente, 894 F.2d 1000, 1003-05 (8th Cir.), cert. denied, 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990). Darden does not contend that the District Court was unaware of its authority to grant him a departure, and the record reveals that the court was in fact aware of this authority. This issue is therefore not reviewable by this Court.
 
 
 159
 In sum, we conclude that Darden's life sentence was properly imposed.
 
 VI.
 
 160
 In addition to the issues addressed in the foregoing sections, the appellants have raised and briefed a number of issues.[18] These issues include arguments that the District Court (1) erred when it refused to dismiss the indictment (or parts of the indictment) as unconstitutionally vague; (2) abused its discretion by allowing the government to make improper remarks in its opening statement; (3) erred when it accepted plea agreements from co-conspirators and government witnesses Thomas, Weaver, Michael Shephard, and Michael Lewis; (4) erred when it refused to the dismiss the charges against Hopkins and Bennett as barred by the Double Jeopardy Clause; (5) erred when it permitted the government to use peremptory challenges to exclude potential Jurors 60, 64, and 70 from the jury; (6) erred when it refused to permit the appellants to present all of their arguments to the jury; (7) abused its discretion by limiting defendants' closing arguments to sixteen hours; (8) abused its discretion when it denied Amerson's Rule 17(b) motions to issue subpoenas and authorize travel expenditures for defense witnesses; and (9) abused its discretion by permitting the government to remind defense witnesses that they may be prosecuted for perjury if they lie on the stand. We have considered the arguments of the appellants and the government on these issues, and, when appropriate, we have reviewed the relevant portions of the record. Each of these claims is without merit. Accordingly, the District Court's rulings on the matters listed above are affirmed. Additionally, because the appellants have identified only one ruling of the District Court that constitutes error, which we have held was not prejudicial, appellant Darden's argument that the cumulative effect of the court's errors deprived him of due process of law is also without merit.
 
 VII.
 
 161
 For the reasons stated, the convictions and sentences of the appellants are affirmed.
 
 
 162
 HEANEY, Circuit Judge, concurring in part and dissenting in part.
 
 
 163
 This is a difficult and complex case that was tried over several months. The majority has written a careful opinion in which it has considered at length the numerous objections raised by the several defendants. I find myself in agreement with the majority that the convictions and sentences of Carlton Darden, Michael Williams, Raymond Amerson, Gerald Douglas Hopkins, Jerry Lee Lewis, and Noble Laverne Bennett should be affirmed. I also agree that there is sufficient evidence in this record to support the conviction of Carla Simone Seals, but I do not believe that her life sentence can be affirmed.
 
 
 164
 Before discussing Seals' sentence, it is necessary to set forth my views on two evidentiary matters. First, the district court permitted Ronald Thomas to testify about numerous murders he committed between 1975 and 1977. None of these murders had any connection to the charges against the defendants in the present case and should not have been received. The government's argument that it was necessary to bring out these prior crimes in its direct examination of Thomas, lest the defendants try to discredit him as a witness, is a feeble excuse. If the district court had permitted the defendants to bring out this evidence in their cross-examination of Thomas, the government could have made an appropriate response in rebuttal. The admission of this evidence was particularly prejudicial to Seals, the only defendant who was not charged with murder or conspiracy to commit murder, and may well have influenced the court's decision to sentence Seals to life imprisonment.
 
 
 165
 The district court also received the testimony of George Noel that in the early 1970s he was one of the several young assistants to James "Fats" Woods's heroin trafficking in the Pruitt-Igoe housing complex. Again, this testimony was not relevant, and even if it were relevant, it should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. See Fed.R.Evid. 403.
 
 
 166
 The above errors would, under some circumstances, require this court to reverse the conviction of many of the defendants, particularly Seals; but here, the relevant evidence of the defendants' guilt for the charged offenses was so overwhelming that the district court's errors do not call for a reversal. See Fed.R.Crim.P. 52(a); United States v. DeAngelo, 13 F.3d 1228, 1233 (8th Cir.1994) (evidentiary rule violations that do not affect constitutional rights are subject to Rule 52(a) harmless error analysis). It follows that I agree with the majority that the conviction of Seals and the other defendants should be affirmed.
 
 
 167
 Seals' sentence, however, must be reversed because it does not comport with the guidelines. The district court, based on its finding that Seals participated in the first degree murder of Ronnie Anderson, sentenced her to life imprisonment. The court also found that Seals participated in the attempted murder of Lorenzo Petty. The prosecution had not charged her with either offense, had not listed either offense as an overt act in the indictment, and had not submitted either offense to the jury in the verdict form. It follows that the jury made no credibility determinations as to Seals' participation in murder or attempted murder. With respect to Seals' narcotics offenses, the court held her accountable for the distribution of 213 kilograms of cocaine. It based its finding on its determination that this was the total amount of cocaine involved in the conspiracy and that it was going to treat Seals exactly the same as it had treated other members of the conspiracy. The base offense level for 213 kilograms of cocaine is 38, to which the court added two offense levels for her possession of a firearm.
 
 
 168
 I come first to the trial court's finding that Seals was guilty of the Anderson murder and of the attempted murder of Petty. In my judgment, no person should be sentenced for murder or attempted murder unless they have been charged and convicted of the same after a jury trial. I realize, however, that my position is a minority one within our circuit and that, under the guidelines, a district court could sentence a convicted defendant for these offenses if the evidence indicated, by a preponderance of the evidence, that the defendant has participated in them. In this case, however, there was no such preponderance; thus there was no basis for the district court to sentence Seals for either the murder or the attempted murder.
 
 
 169
 In imposing a sentence under the guidelines, federal courts look to the underlying state offense. See United States v. Couch, 65 F.3d 542, 544 (6th Cir.1995). Under Missouri law, for a person to be convicted of murder, jurors must conclude that (1) she committed actions that aided in the killing of the victim, (2) her conscious purpose in committing these actions was the killing of the victim, and (3) she committed these actions after coolly deliberating on the victim's death for some amount of time no matter how short. State v. O'Brien, 857 S.W.2d 212, 218 (Mo.1993). Even if a court applied federal law, to convict a person as an aider and abettor of first degree murder, there must be proof that the person knew, before engaging in any conduct, that the objective of her actions was to murder an individual. See United States v. Wilson, 665 F.2d 825, 830 (8th Cir.1981) (construing 18 U.S.C. Secs. 2, 1111 (1976)), cert. denied, 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982).
 
 
 170
 The record in this case is devoid of any evidence of Seals' knowing participation in the murder of Anderson or the attempted murder of Petty. The only evidence of her involvement in the Anderson murder was statements made by Thomas that Seals attended a meeting where the gun used in the murder was loaded and that she later delivered the gun to another residence.[1] The evidence as to her involvement in the attempted murder of Petty was similarly slight: Rudy Weaver testified that Seals delivered an Uzi to Jerry Lewis or to Mack Tompkins that was at some later occasion used in the attempted murder. Accepting these allegations as true, the mere transportation of guns is not a sufficient basis on which to sentence Seals for murder. There is no evidence in the record that it was Seals' conscious purpose in delivering the guns that anyone be killed, or that she deliberated on anyone's death for any period of time. There is no evidence as to what Seals knew about the guns and their intended use. There is simply no evidence of Seals' intent to kill either of the two men as required for first degree murder. The district court's findings with respect to these offenses must be set aside. Seals' life sentence for the murder of Anderson and the lesser sentence for the attempted murder of Petty cannot stand.
 
 
 171
 Without sufficient evidence to impose a sentence for either murder offense, we are left with the evidence of Seals' participation in the narcotics offenses. Her sentence for the drug offense depends on the quantity of drugs for which she is held accountable under U.S.S.G. Sec. 2D1.1. Although a conspirator is responsible for all criminal acts committed in furtherance of the conspiracy, such conduct is not included in establishing the defendant's offense level unless the conduct was (1) within the scope of the defendant's agreement and (2) reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake. See U.S.S.G. Sec. 1B1.3(a)(1) and Comment n. 1; United States v. Olderbak, 961 F.2d 756 (8th Cir.), cert. denied, 506 U.S. 959, 113 S.Ct. 422, 121 L.Ed.2d 344 (1992). Our court has recognized that "in multi-level drug networks, defendants may aid conspiracies that span far beyond their actual participation" and has explicitly rejected automatically attributing the entire amount of drugs involved in a conspiracy against every participant. United States v. Jones, 965 F.2d 1507, 1517 (8th Cir.), cert. denied, 506 U.S. 924, 113 S.Ct. 346, 121 L.Ed.2d 261 and 506 U.S. 965, 113 S.Ct. 439, 121 L.Ed.2d 358 and --- U.S. ----, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1992). Rather, in sentencing a co-conspirator, the court must make an individualized assessment as to the reasonable foreseeability of the activity for which she will be sentenced. In determining reasonable foreseeability, we look to factors such as whether an individual has benefitted from her co-conspirator's activities and not simply whether the individual knows that a dealer with whom she works sells large amounts of drugs to other people. See Jones, 965 F.2d at 1517.
 
 
 172
 In sentencing Seals, the district court did not make an individualized assessment of the quantity of drugs reasonably foreseeable to her given her involvement in the drug enterprise. Instead, the district court decided to base Seals' sentence on the same amount of drugs it had based the sentences of all the other members of the drug conspiracy, 213 kilograms of cocaine. Sentencing Tr. at 329. A district court cannot simply conclude that all members of a conspiracy to distribute drugs are to be charged with identical amounts. Of course, had the trial testimony supported a determination that it was reasonably foreseeable to Seals that 213 kilograms of cocaine would be distributed, the court could have based its finding on the trial record; but such evidence was lacking in this case. Only three overt acts involving Seals were alleged in the indictment: (1) distribution of cocaine in the summer of 1987 in a former department store building, (2) distribution of cocaine in the summer of 1987 at a medical office building, and (3) possession and possession with intent to distribute cocaine on June 28, 1987. The jury found Seals guilty of these narcotics violations. These transactions in the summer of 1987 involved unspecified amounts of cocaine. There was no evidence at trial as to the extent of Seals' benefit from the sale of drugs or of her personal involvement beyond the three sales. The district court lacked the information necessary to determine Seals' level of involvement and needed to make factual findings concerning foreseeability to sentence her properly. Although such fact-finding may be burdensome and time-consuming for the district court, it is necessary under the guidelines and our court repeatedly has required it. I, therefore, would remand Seals' case to the district court to make express findings concerning foreseeability and to re-sentence her accordingly.
 
 
 173
 In addition, the district court erred in increasing Seals' offense level by two points for the possession of a firearm. The court stated that the gun possession was "all part of the drug enterprise." Sentencing Tr. at 352. The only evidence of Seals' possession of a firearm, however, was not during the commission of her drug offenses. Therefore, Seals' gun possession does not support an upward adjustment under U.S.S.G. Sec. 2D1.1(b).
 
 
 174
 In conclusion, I agree with the majority that the convictions of all defendants should be affirmed, but I believe Seals' life sentence is improper and that her case must be remanded to the district court for re-sentencing. There is insufficient evidence to sentence Seals for either murder or attempted murder and the court must make an individualized assessment of the quantity of drugs that was reasonably foreseeable to Seals.
 
 
 
 [1]
 The Moorish Science Temple was founded in 1913 in Newark, New Jersey, by Timothy Drew, also known as Noble Drew Ali, a black delivery man from North Carolina. Drew taught that Christianity is a religion for whites and that the true religion of blacks is Islam. According to Drew, all blacks in the United States are descended from three Moroccan tribes, the Alis, Beys, and Els, and blacks are not "Negroes" but "Moorish-Americans." See 1 The Encyclopedia of Religion 101 (1987). Members add the hyphenated names "Ali," "Bey," or "El" to their surnames to reflect this belief. The St. Louis branch of the MSTA has been active in the Missouri prison system for two decades and recruits almost all of its members from the inmate population
 The appellants in this case who are MSTA members were indicted under their legal names. This opinion therefore does not use the Islamic surnames adopted by some of the appellants.
 
 
 [2]
 The Honorable George F. Gunn Jr., United States District Judge for the Eastern District of Missouri
 
 
 [3]
 Throughout their briefs, appellants liberally adopt the arguments of their colleagues. Unless a specific appellant's adoption of an argument affects our analysis of the issue, we will not refer by name to the appellants who adopt, without independent argument, the contentions of other appellants
 Additionally, a substantial number of other issues were mentioned in passing in the appellants' briefs. Without any arguments or citations to the record that would assist us in judging the merits of those claims of error, we decline to address them. See Jasperson v. Purolator Courier Corp., 765 F.2d 736, 740 (8th Cir.1985) (holding that failure to discuss issue in appellate brief constitutes abandonment of that issue).
 
 
 [4]
 Darden also argues the government failed to prove that the single narcotics conspiracy charged existed or that he ever agreed to join it. We reject these contentions for the same reasons we reject the contentions that the single RICO enterprise charged consisted of multiple conspiracies and that Darden was not a member of the RICO conspiracy. See supra pp. 1518-21, 1522
 
 
 [5]
 Appellant Amerson adopts Williams's severance arguments. By failing to argue how the District Court's refusal to sever his case prejudiced him specifically, however, he has waived this issue. Whether a defendant's trial should be severed from the trial of co-defendants "is a fact-related issue not subject to incorporation by reference." United States v. Lucht, 18 F.3d 541, 553 n. 3 (8th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 363, 130 L.Ed.2d 316 (1994)
 
 
 [6]
 Citing United States v. Casamento, 887 F.2d 1141, 1152 (2d Cir.1989), cert. denied, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043, 495 U.S. 933, 110 S.Ct. 2175, 109 L.Ed.2d 504 and id. at 958, 110 S.Ct. at 2564, 109 L.Ed.2d 746 (1990), Darden and Seals state that the Second Circuit has adopted a presumption against joinder in so-called "mega-trials." The Second Circuit has done no such thing; the court in Casamento merely suggested that trial courts "oblige the prosecutor to present a reasoned basis" to support joinder when the trial is estimated to last longer than four months. Id
 
 
 [7]
 Williams's brief does not argue that any specific co-conspirator statements were inadmissible, but that the admission of the statements was "precluded under multiple conspiracy law." Williams's Brief at 18. His arguments thus fail as we have concluded that the government sufficiently proved the existence of a single conspiracy
 
 
 [8]
 Of the twenty-eight potential jurors, twenty-two were white, five were black, and one was Hispanic. The government used three of its six peremptory challenges to remove white jurors, and three to remove black jurors. Of the twelve potential alternate jurors, ten were white and two were black. The government used two of its three peremptory challenges to remove white jurors, and one to remove a black juror. The government's use of its challenges thus belies the appellants' accusation of systematic discrimination
 
 
 [9]
 This Court briefly addressed the issue of an anonymous jury in United States v. Lee, 886 F.2d 998 (8th Cir.1989), cert. denied, 493 U.S. 1032, 1033, 1034, 110 S.Ct. 748, 751, 754, 107 L.Ed.2d 765, 768, 770 and 495 U.S. 906, 110 S.Ct. 1926, 109 L.Ed.2d 290 (1990). In Lee we noted that the defendants' attorneys were provided with the names of the jurors and found "no prejudice in the court's procedure" without further comment. Id. at 1001-02
 
 
 [10]
 In determining the need for this and other security measures, the District Court relied in part upon substantial documentation provided by the government prior to the trial. See Government's Response to May 14, 1992, Defense Verbal Objections to Use of an Anonymous Jury; Government's Trial Memorandum in response to the District Court's May 20, 1992 Memorandum re: Pre-Trial Matters
 
 
 [11]
 Members of the MSTA frequently wear fezzes to signify their membership in the Temple
 
 
 [12]
 Appellants also challenge the District Court's use of Instruction 16, which repeats the objectionable phrase used in Instruction 15. To the extent that appellants' objections to Instruction 16 are the same as their objections to Instruction 15, they are resolved by our decision regarding Instruction 15
 
 
 [13]
 The Court in Reves does not focus on the term "control" except to reject the D.C.Circuit's conduct test that required "significant control over or within an enterprise." Reves, 507 U.S. at 179 n. 4, 113 S.Ct. at 1170 n. 4 (quoting with disapproval Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Union 639, 913 F.2d 948, 954 (D.C.Cir.1990) (en banc) (emphasis added), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991))
 
 
 [14]
 The dissent, post at 1551, argues that the record in this case "is devoid of any evidence of Seals' knowing participation in the murder of Anderson." We note, however, that even Seals does not go this far. She concedes that evidence in the record shows that she was "involved in the plot," that she "was present at a discussion about killing Ronnie Anderson," and that she "transported a gun to a house" and that Thomas then used the gun to kill Anderson. Seals's Brief at 49. Seals argues that the District Court should not have relied on that evidence and should have relied on other evidence that allegedly contradicts the evidence of her involvement. She does not argue, as the dissent apparently believes, that the evidence in the record, even if believed, is insufficient as a matter of law. To the contrary, her argument essentially concedes the sufficiency of the evidence absent a decision from this Court that reverses the District Court's credibility determinations
 
 
 [15]
 Amerson, Hopkins, Seals, and Williams also argue that the District Court erred by finding that they were accountable for at least 213 kilograms of cocaine, resulting in a base offense level of 38 under U.S.S.G. Sec. 2D1.1(a)(3). We need not address their arguments because, even if successful, they would not affect their sentences. The court found that each of these defendants was accountable for first degree murder, and only Seals has challenged the court's finding. We have decided that issue against her. See supra p. 1545. The resulting guidelines base offense level of 43, see U.S.S.G. Sec. 2A1.1, carries a mandatory sentence of life in prison. Accordingly, we do not address the drug quantity arguments of these appellants
 
 
 [16]
 The court also found that Darden was accountable for "large but unmeasurable" amounts of heroin, methamphetamine, marijuana, and T's and blues. Darden Presentence Investigation Report p 27
 
 
 [17]
 We need not address Darden's argument concerning the enhancement applied for the attempted murder of Lidell "Bud" Green because it would have no impact on his sentence. Darden's final offense level (43) was obtained by taking the adjusted offense level for the aggregated drug offenses (42) and adding a one level "multiple-count adjustment" for the attempted murder of Bartlett pursuant to U.S.S.G. Sec. 3D1.4. The attempted murder of Green did not affect his total offense level and thus had no impact on his sentence. See Darden Presentence Investigation Report at 11. For the same reason, we decline to address Darden's argument that he should have received a two-level minor-participant reduction based on his limited role in the attempted murder of Green
 
 
 [18]
 Appellant Jerry Lewis also raises a number of issues in his reply brief that were not briefed in his opening brief. Appellants generally must raise and brief all issues in their opening brief. See Mississippi River Corp. v. F.T.C., 454 F.2d 1083, 1093 (8th Cir.1972); see also Fed.R.App.P. 28(a). Absent some reason for failing to do so, we will not consider an issue first raised in a reply brief. Lewis has not offered any explanation for his default, and we will not consider those improperly raised issues
 
 
 [1]
 At sentencing, Seals' counsel objected to the findings in the Presentence Investigation (PSI) that Seals had participated in the Thomas murder and the attempted murder of Petty. Sentencing Tr. at 342-344. The district court responded, "I thought that there was a--on the murder or attempted murder that there was a[n] implication of Miss Seals on that as supplying the weapon to--two instances in supplying Uzis." Id. at 343. In imposing Seals' sentence, the court stated further:
 You got involved with very bad group of people and you got caught up in it....
 ....
 Based on the most serious nature of the offense which consisted of large scale--of a large scale racketeering enterprise which involved murder, [the] sentence would seem to address the sentencing objectives of punishment, general deterrence and incapacitation.
 Id. at 365, 366. These findings fall short of those necessary to sentence Seals for these grievous offenses. Given Seals' counsel's objections to the PSI, the sentencing court was obligated to make specific findings that Seals had participated in the Anderson murder and an attempted murder of Petty. F.R.Crim.P. 32(c)(3)(D). The court did not make such findings. It is apparent from the record that the court rather concluded that because Seals had been found, by the jury, to have participated in the conspiracy, it was appropriate to sentence her for murder.